OPINION OF THE COURT
Jones, J.
In determining whether a particular ecclesiastical body has been organized and is conducted exclusively, for religious purposes, the courts may not inquire into or classify the content of the doctrine, dogmas, and teachings held by that body to be integral to its religion but must accept that body’s characterization of its own beliefs and activities and those of its adherents, so long as that characterization is made in good faith and is not sham. On this principle it must be concluded that the Unification Church has religion as its “primary” purpose inasmuch as much of its doctrine, dogmas, and teachings and a significant part of its activities are recognized as-religious, and in good faith *519 it classifies as religious the beliefs and activities which the Tax Commission (Commission) and the court below have described as political and economic.
The Holy Spirit Association for the Unification of World Christianity (the Church) is one of more than 120 national Unification Churches throughout the world propagating a common religious message under the spiritual guidance of the Reverend Sun Myung Moon, the Unification movement’s founder and prophet. The Church was organized as a California nonprofit corporation in 1961, and since 1975 has maintained its headquarters in New York City.
In March, 1976 the Church applied to the Tax Commission of the City of New York under section 421 (subd 1, par [a]) of the New York Real Property Tax Law[1] for exemption from real property taxes for the tax year beginning July 1, 1976 of three properties title to which it had acquired in 1975. The three properties are: the Church headquarters, located at 4 West 43rd Street in the Borough of Manhattan; the missionary residence, located at 305 West 107th-Street in Manhattan; and the maintenance and storage facility, located at 38-38 Ninth Street in the Borough of Quéens. Following hearings, the Tax Commission on September 21, 1977, by a vote of 4 to 3' denied the application. The majority concluded that, “although the applicant association does in certain respects bespeak of a religious association, it is in our opinion so threaded with political motives that it requires us to deny its application”. Having con-, eluded that the Church was not organized or conducted exclusively for religious purposes, the majority of the Commission had no occasion to consider whether the three properties were used exclusively for religious purposes. The dissenting members of the Tax Commission, explicitly declining to judge the validity or. content of the religious beliefs of the Church or its adherents or to submit the Church’s theology to analysis, concludéd that the Church was organized exclusively for religious purposes and that *520 the three properties in question were used exclusively for statutory purposes. The dissenters would therefore have granted the application.
The Church then instituted the present proceeding under CPLR article 78 for judgment annulling the determination of the Commission, directing that the Church’s application be granted, and declaring that the three properties are entitled to tax exemption. By order dated September 21,1977 Supreme Court, New York County, transferred the proceeding to the Appellate Division. The Appellate Division, declaring itself unable to determine on the record then before it whether the Commission had acted arbitrarily and capriciously in denying the exemption, remanded the matter for a hearing by a Special Referee, holding the article 78 proceeding in abeyance pending receipt of the referee’s report.
Between January 15 and December 7, 1979 the Special Refereé heard extensive testimony as to the nature of the Church, the Church’s purpose and activities, and the uses of the three properties. On August 25, 1980 the Special Referee issued his report concluding that the Church’s primary purpose is religious but finding that the Commission had not acted arbitrarily or capriciously in its determination that “the Church is so inextricably interwoven with political motives and activities as to warrant denial of the tax exemption”, adding that “the evidence at the hearing established that petitioner’s religious purposes are intertwined with political and economic objectives that form an amalgam”.
On May 5, 1981 the Appellate Division confirmed the report of the Special Referee and the determination of the Commission by a vote of 4 to 1. Because that court, in reviewing the determination of the Commission invoked erroneous’legal principles (as did the majority of the Commission in ruling on the Church’s application for tax exemption), we now reverse..
It is appropriate at the threshold to delineate our holding in this case — to make explicit what we are not as well as what we are called on to decide. We are not called on to determine whether the Church has any real religious *521 purpose or whether any of its doctrine, dogmas, and teachings constitute a religion. In this case it is recognized that at least many of the beliefs and a significant part of the activities of the Church are religious and that the Unification movement at least in part is a religion. The determination of the Tax Commission, the report of the Special Referee, the opinion at the Appellate Division and now the arguments of the Tax Commission in our court all, at least implicitly, accept this proposition.
The issue that we confront is a narrower one — is the Church, many of whose beliefs and activities are religious, organized and conducted primarily[2] for religious purposes within the contemplation of section 421 (subd 1, par [a])? This, as understood by the Tax Commission and the Appellate Division, turns on whether the Church is engaged in so many or such significant nonreligious activities as to warrant the conclusion that its purpose is not primarily religious. More specifically the issue is whether the activities which have been found to be “political” and “economic” are for the purposes of that statute to be classified as secular rather than religious.
When, as here, particular purposes and activities of a religious organization are claimed to be other than religious, the civil authorities may engage in but two inquiries: Does the religious organization assert that the challenged purposes and activities are religious, and is that assertion bona fide? Neither the courts nor the administrative agencies of the State or its subdivisions may go behind the declared content of religious beliefs any more than they may examine into their validity. This principle was firmly established in Watson v Jones (13 Wall [80 US] 679, 728) when the Supreme Court declared that “[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.” That court again condemned the judicial pursuit>of any such investigation in Board of Educ. v Barnette (319 US 624, 640-642, n omitted):
*522 “Struggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men * * * As first and moderate methods to attain unity h,ave failed, those bent on its accomplishment must resort to an ever-increasing severity. As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be * * * Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity [to] the Inquisition, as a means to religious and dynastic unity * * * Compulsory unification of opinion achieves only the unanimity of the graveyard.
“It seems trite but necessary to say that the First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings * * *
“If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion *** If there are any circumstances which permit an exception, they do not now occur to us.” The articulation of the Supreme Court in foreclosing judicial inquiry into the truth or falsity of religious beliefs is equally applicable to judicial inquiry as to the content of religious beliefs.
“Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. * * * It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to the followers of the orthodox faiths. Heresy trials are foreign* to our Constitution. Men may believe what they cánnot prove. They may not be put to the proof of their religious doctrines or beliefs * * * Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations * * * The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if these doctrines are subject to trial before *523 a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.” (United States v Ballard, 322 US 78, 86-87.)
The reliance by the Tax Commission and by the Appellate Division on Christian Echoes Nat. Ministry v United States (470 F2d 849) as authority for their examination and consequent characterization of the activities of the Church is misplaced (aside from whether the holding in that case has been subsequently eroded). The issue in that case was the entitlement of a religious organization to tax exemption under the Internal Revenue Code. The statute there involved (US Code, tit 26, § 501, subd [c], par [3]) in effect deprived a religious organization which would otherwise be tax exempt of that exemption if a substantial part of its activities was carrying on propaganda or otherwise attempting to influence legislation or if it participated in political campaigns on behalf of candidates for public office. We are not here concerned with whether the Legislature has authority, should it choose to do so, to deny exemption to an organization whose purpose is primarily religious but which as part of its religious program devotes a substantial portion of its activities to political objectives. It suffices for our present purposes to note that section 421 (subd 1, par [a]) includes no such provision.[3]
We turn then to the first avenue of inquiry allowed us, namely, whether the Church asserts that its religious doctrine and teachings embrace the challenged activities. We quote the statement with respect to the history and doctrine, dogmas and teachings of the Church from the brief of the Church in our court (without its footnote references to sources in the record).
*524 “Thé Unification movement has its origins in Korea as one of the host of revivalist Christian religions that flourished there in the aftermath of the forty-year Japanese occupation (1905-1945), during which Korean religions were suppressed. Common to many of these new, patriotic religions was the theme of Korea as the modern Holy Land, birthplace of the new Messiah. This theme likewise animates the religion founded by the Reverend Moon.
“Unification theology is based on the teachings of the Old and New Testaments as clarified by revelations held to have been received by the Reverend Moon directly from Jesus Christ beginning in 1936, and subsequently recorded by his followers in the book Divine Principle. Central to Divine Principle is the millenialist conviction that the time has come for the forces of God to reclaim the earth from the forces of Satan, and to restore ‘the Kingdom of God on earth.’
“According to Unification theology, the ‘great promise of Christianity’ is ‘the return of Christ’ — ‘not as a visiting God but as a sinless man’ — to complete the work Jesus began 2,000 years ago. Unification faith holds that ‘when Jesus came he was the Messiah,’ the perfect image of God. Through the Resurrection, the Church believes, Jesus brought ‘spiritual salvation,’ but the physical institutions of this world — beginning with the family — remained unredeemed; in the Church’s view, it" is for the new Messiah to restore a Bride and establish the True Family serving as the foundation for ending ‘the existence of evil in the world,’ and to accomplish ‘not only spiritual but also physical’ salvation for mankind. Adherents of the Unification faith look to the Reverend Moon to accomplish this task.
“In Unification doctrine, every temporal sphere — political, cultural, and economic — is a battleground for the forces of God and the forces of Satan. God-denying Communism is deemed a singularly potent evil, threatening to overwhelm the forces of God just as Cain overwhelmed Abel; the division between North and South Korea is seen as a central providential instance of the struggle between the sons of Adam. Other temporal controversies also assume crucial spiritual significance in Unification theology.
*525 “Committed to the view that men and women need no ‘mediator between themselves and God,’ Unification faith makes no provision for a ‘priestly class.’ All members of the Church, for example, are qualified to conduct prayer services and other religious activities. Church members fall into two categories — some 7,000 members, serving the Church full-time, are engaged in some combination of evangelical, educational, pastoral, and fund-raising activities, and rely upon the Church or local Church units to meet their material needs; the remaining 30,000 members accept the tenets of the Church as their faith but devote less than full-time efforts to the Church. Representing a movement that proclaims ah urgent millenialist gospel, the Church appeals primarily, but not exclusively, to the young.”
There can be no doubt on the record before us that the Church has amply demonstrated that it does indeed assert that those beliefs and activities which the Tax Commission and the Appellate Division have found to be political and economic are of thev essence of its religious doctrine and program. This has been the finding at every stage of this matter. The Special Referee reported that “the petitioner’s theological doctrines bind petitioner to a course of political activism”, that “petitioner believes that the physical world consisting of science and economics as well as the spiritual world consisting of religion have developed in accordance with ‘God’s providence’ and that ‘religion and economy relate to social life through politics’ ”, that “it is petitioner’s religious tenet that the republican form of goverment with separate or coequal powers held by the legislatives, judicial and executive branches of government is a Satanic principle and that these three governmental branches under the presfent political system must be brought under a single controlling force as a condition for the, second coming of the Messiah”; that “according to the Divine Principle, the forces of Satan must be subdued and Korea unified undér the type of political environment where religions and science are unified in order to make the world ready for the second coming of the Messiah”; and that “it also appears that petitioner is opposed to the constitutionally mandated separation of church and State.” Following a *526 recital of illustrative examples of “political” activities, the report continues, “The petitioner’s involvement in these political activities is not an escalated mobilization in behalf of a political cause. Each activity is consistent with the expression of political motives set forth in the Divine Principle and is part of an over-all plan and it is petitioner’s deployment of its cadre and administrators for these activities that mark its involvement in political causes”. “One of the principal tenets advanced in the Divine Principle is that there be complete integration of all economic, social and religious activities.”
The Appellate Division described the referee as reporting, “that petitioner’s primary purpose is religious, but that petitioner’s theology, as expressed in Reverend Moon’s writings binds it to a course of political activity”. (81 AD2d, p 68.) That court itself concluded that “religious and nonreligious themes are inextricably intertwined in the doctrine”, and that, “[therefore, despite the religious content of the doctrine, and the leitmotif of religion with which the eclectic teachings are tinged, the doctrine, to the extent that it analyzes and instructs on politics and economics has substantial secular elementé.” (81 AD2d, p 75.)
We conclude that it has been sufficiently demonstrated that what have been characterized below as political and economic beliefs and activities are in the view of the Church integral aspects of its religious doctrine arid program.
We turn then to the second avenue of our restricted inquiry. No serious question can be raised on the record before us[4] that the Church has demonstrated the sincerity and the bona fides of its assertions that in its view the political beliefs and activities of the Church and its members and the efforts which they devote to fund raising and recruitment are at the core of its religious beliefs. The Tax Commission found that the Church “does in certain aspects bespeak of a religious association”; the Special Referee reported that the Church’s “primary purpose is religious” *527 and that “it is religious in nature and nothing contained in this report should be considered as constituting a comment on the sincerity or lack of sincerity with which any members of [the Church] practices his faith”. The Appellate Division concluded “that one of [the Church’s] purposes is religious”. We do not confront in this case an organization every aspect of whose claim to being religious is challenged, and whose bona fides might accordingly be said to be suspect.
The error of the majority of the Tax Commission, of the Special Referee and of the majority at the Appellate Division is that each asserted the right of civil authorities to examine the creed and theology of the Church and to factor out what in its or his considered judgment are the peripheral political and economic aspects, in contradistinction to what was acknowledged to be the essentially religious component.[5] Each then took the view that beliefs and activities which could be objectively accurately described by knowledgeable outsiders as “political” and “economic” were by that fact precluded from being classified as “religious”.[6]
As stated, it is not the province of civil authorities to indulge in such distillation as to what is to be denominated religious and what political or economic. It is for religious bodies themselves, rather than the courts or administra *528 tive agencies, to define, by their teachings and activities, what their religion is. The courts are obliged to accept such characterization of the activities of such bodies, including that of the Church in the case before us, unless it is found to be insincere or sham.
Applying this principle, we conclude that on the record before us, as a matter of law, the primary purpose of .the Church (much of whose doctine, dogmas and teachings and a significant part of whose activities are recognized as religious) is religious and that the determination of the Tax Commission to the contrary is both arbitrary and capricious and affected by error of law.
Determinations with respect to the use to which each of the three individual properties is put, however, cannot be made as a matter of law. Accordingly, inasmuch as such determinations should be made in the first instance by the Tax Commission rather than by the courts, tlie case must be remitted to Supreme Court with. directions to it to remand to the. Tax Commission to make determination as to the use of each of the three properties in conformity with the views expressed in this opinion.
For the reasons stated, the judgment of the Appellate Division should be reversed, without costs, and the cage remitted to Supreme Court for further remand in accordance with this opinion.
Chief Judge Cooke and Judges Jasen, Gabrielli, Wachtler, Fuchsberg and Meyer' concur.
Judgment reversed, without costs, and matter remitted to Supreme Court, New York County, with directions to remand to the Tax Commission of the City of New York for further proceedings in accordance with the opinion herein.

. New York Real Property Tax Law (§ 421): “1. (a) Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, moral or mental improvement of men, women or children or cemetery purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation or association as hereinafter provided shall be exempt from taxation as provided in this section.”

. The statute uses the adverb “exclusively”, but we have held that it connotes “principally” or “primarily” (Matter of Association of Bar of City of N. Y. v Lewisohn, 34 NY2d 143, 153).

. Nor are we here concerned with cases (quotations from which are relied on by the Tax Commission), relating to the authority of the State in the employment of its police power to regulate or restrict the exercise of what are concededly religious principles, in which the courts deny the right of the religious group to be final arbiter of the issue (e.g., Wisconsin v Yoder, 406 US 205 [holding Wisconsin’s compulsory school-attendance law unconstitutional as applied to members of the Amish religion because contrary to their religious beliefs]; United States v Seeger, 380 US 163 [upholding claims by conscientious objectors to exemption from universal military service]).

. Before the Tax Commission the Church offered evidence from five witnesses, together with substantial documentary proof. At the hearings before the Special Referee, it introduced the testimony and accompanying documentary submissions of 16 witnesses, covering some 1,340 pages of the transcript.

. The Appellate Division was explicit in this regard: “We are compelled to conduct a broad inquiry into [the Church’s] doctrine and activities in order to determine whether petitioner qualifies for the tax exemption provided by law.” (81 AD2d, pp 71-72.)

. o If such categorization were to be undertaken we note that substantial arguments are advanced that traditional theology has. always mandated religious action in social, political and economic matters. Numerous illustrations are cited of essentially religious concern and activity in areas of political and economic action in J udeo-Christian history. The point is made that virtually all of the recognized religions and denominations in America today address political and economic issues within their basic theology. (See, e.g., the briefs of the amici curiae filed in support of the position of the Church on this appeal: American Civil Liberties Union and New York Civil Liberties Union] American Jewish Congress; The Catholic League for Religion and Civil Rights; The National Association of Evangelicals, and The Center for Law and Religious Freedom of the Christian Legal Society; and National Council of Churches of Christ in the U. S. A., and New York State Council of Churches.) As reiterated, however, it is not for the courts to make judgments with reference' to these substantive matters. .