CALVARY BAPTIST CHURCH OF TILTON, Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

Fourth District   No. 4—03—0205

Argued January 27, 2004.—Opinion filed March 30, 2004.—Rehearing denied July 22, 2004.

John P. Wolgamot and Steven L. Blakely (argued), both of Acton & Snyder, of Danville, for appellant.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Karen J. Dimond (argued), Assistant Attorney General, of counsel), for appellees.

JUSTICE MYERSCOUGH delivered the opinion of the court:

Plaintiff, the Calvary Baptist Church of Tilton (Calvary), appeals the circuit court's affirmance of a March 2002 decision of the Director of the Department of Revenue of the State of Illinois (Department) denying Calvary's application for a religious-use tax exemption for its property, arguing the property in question is used primarily for religious purposes and that denial of a tax exemption violates the Religious Freedom Restoration Act (775 ILCS 35/1 through 99 (West 2000)). We reverse.

# I. BACKGROUND

On December 4, 2002, plaintiff filed an application for religious-use property tax exemption with defendant, the Department. The property consists of 4.54 acres with two buildings: a 900-square-foot building containing a meeting room, small kitchen, and bathrooms; and a 200-square-foot utility shed used for storage. The property is also improved with an 18-hole miniature golf course, a sand volleyball court, playground equipment, and a pavilion consisting of a concrete floor and covered picnic tables. The property is fenced and has a parking area. Throughout 2000, the property was used for Bible study classes, teen ministry events and meetings, fellowship events, and devotional activities. William Benzing, Calvary's administrator, also averred that six "occasional and incidental secular events" took place on the property in 2000, including family reunions, baby showers, birthday parties, and a wedding reception. Income is derived from the property in that whenever a group or person not affiliated with Calvary uses the property for a religious or secular purpose, a $25 donation is suggested for daytime use and $50 for evening use to defray the power bill for the property. However, the donation is strictly voluntary.

On February 16, 2001, the Department denied Calvary's application for property tax exemption, finding the property is not in exempt use. On February 27, 2001, Calvary filed an application for a hearing on the Department's February 16, 2001, decision. On May 8, 2001, the Department issued an order setting a hearing on the Department's decision for July 23, 2001. At the hearing, the attorney for the Department asked the administrative law judge (ALJ) to take notice that Calvary's application for an exemption as to this property had been denied once before in September 1999 following a hearing and that it was the Department's position that nothing had changed since then.

Pastor Joe Humrichous testified for Calvary. The property in question is referred to as "the FARM," an acronym for Family And Recreational Ministry. Calvary's mission is to bring in new followers of its faith through teaching, fellowship, the rite of communion, prayer, and evangelism. The FARM is used for those activities and as a location for regular Bible study. In 2000, a college-age group met there for Bible study on Monday evenings, Pastor Humrichous taught a Bible study class on the FARM on Tuesday nights, and a teenage Bible study activity occurred there on Wednesday nights. A Bible study taught by one of the members and open to the public was held on Thursday nights. The FARM was also used for fellowships by Sunday school classes and young couples and young families. Calvary also has business and prayer meetings on the FARM. Calvary's ushers met to

discuss improving their service and to have a meal there. Calvary held its missions conference planning on the FARM. A group of teenage members planted a garden on the FARM and distributed the food.

Pastor Humrichous testified regarding an August 19, 2000, all-church golf outing with a picnic and games following at the FARM. This outing was part of Calvary's strategy of evangelism in the hope that those who were invited would become interested in the faith, which can then be shared at the picnic on the FARM. These types of events always involved prayer and sometimes a devotional, where a member shared how he or she joined the faith. Calvary gave one of its members a baby shower on the FARM as part of its ministry to her. Calvary also gave another couple, who both attend Calvary, a wedding reception to encourage their marriage and encourage marriage in the faith. On cross-examination, Pastor Humrichous testified he could not divide the property into areas used primarily for devotionals and those used primarily for fellowship, stating the weather is the primary determinant of where people do what they do.

William Benzing, Calvary's administrator, also testified. Benzing schedules events at the FARM. Benzing testified as to various uses of the FARM, including the following: (1) on April 24, 2000, a Calvary member had her Crisis Care Bible Institute class at the FARM for a fellowship-encouragement; (2) on July 22, 2000, the Southside Church of the Nazarene (Southside Church), a neighboring church, used the FARM for its kickoff picnic for its Faith Promise Missionary Project; (3) on July 25, 2000, Camp Assurance, a Bible camp, used the FARM for a family camp picnic; (4) on July 27, 2000, Faith Evangelical Methodist Church in Fairmont, Illinois, used the FARM for a Sunday school get-together; (5) on July 29, 2000, the Southside Church held a vacation Bible school parade and cookout at the FARM; and (6) on August 2, 2000, the Southside Church had a teen activity and devotion on the FARM. Benzing testified the use of the FARM by other churches was part of Calvary's fellowship with others of the faith to evangelize the community. On April 26, 2000, the Home Fire Home School Association held an outing at the FARM to take pictures of their group and to play golf. Benzing testified a large number of families that belong to Calvary are members of the Home Fire Home School Association so that their use of the FARM would allow fellowship with other home school people in the area. On May 13, and June 4, 2000, Calvary members had birthday parties at the FARM. The birthday parties allowed the Calvary members to share their faith with their guests. On July 7, 2000, a family that belonged to Calvary used the FARM for a gathering to thank friends and coworkers of a deceased family member for their support following the death. On July 9, 2000,

one Calvary member threw a baby shower for another member, and on July 18, 2000, one member threw a wedding shower for another member. On cross-examination, Benzing testified that 30% of the FARM is occupied by the miniature golf course, 4% by the volleyball court, and 30% is open space with no improvements.

On March 15, 2002, the ALJ issued a recommendation for disposition denying the exemption. The ALJ found the facts substantially as they were given in the testimony. After noting that Pastor Humrichous "believes that all activities performed on the [FARM] further the evangelism tenant and are therefore religious," the ALJ found that "for property tax exemptions the Illinois courts and statutes have espoused a much more restrictive definition of what is a religious use of a piece of property." The ALJ then quoted *People ex rel. McCullough v. Deutsche Evangelisch Lutherische Jehovah Gemeinde Ungeaenderter Augsburgischer Confession*, 249 Ill. 132, 136-37, 94 N.E. 162, 164 (1911), in which the Supreme Court of Illinois stated that "[a]s applied to the uses of property, a religious purpose means a use of such property by a religious society *** as a stated place for public worship, Sunday schools[,] and religious instruction." The ALJ concluded that "the subject property is used for a number of purposes, including recreational and social activities unrelated to religious instruction or public worship." However, the ALJ found that had Calvary been able to identify which portions of the FARM are used for Bible study, Sunday school, and devotional purposes, "those areas are used for religious purposes as defined by the statutes and case law" and may have qualified for a partial exemption. The ALJ also found that because the meeting room was used for wedding and baby showers, family reunions, and other special events, Calvary failed to establish that the primary use of that area was for religious purposes. Finally, the ALJ found that application of the religious-exemption statute in this case does not violate the Religious Freedom Restoration Act (775 ILCS 35/1 through 99 (West 2000)) because the Department imposed no burden on Calvary's ability to exercise its religious freedom.

On March 20, 2002, the Director accepted the ALJ's recommended decision and made it final. On April 19, 2002, Calvary filed a complaint for review of administrative decision in the circuit court. On February 25, 2002, the circuit court held the ALJ's finding that Calvary failed to establish that the primary use of the property is religious is not against the manifest weight of the evidence and the Department's denial of a property tax exemption was not arbitrary, capricious, or legally erroneous. The court affirmed the final administrative decision denying Calvary's application for an exemption.

This appeal followed.

## II. ANALYSIS

On appeal, Calvary argues the Department and the circuit court erred by (1) concluding it does not use the property primarily for religious purposes, (2) failing to accept its own good-faith characterization of its own doctrines and activities as religious, (3) applying a standard for religious use that is not recognized in Illinois law, and (4) not finding it was entitled to at least a partial tax exemption. Calvary also argues the denial of its requested tax exemption violates the Religious Freedom Restoration Act. Because we agree that Calvary is entitled to a religious-use exemption and reverse, we need not address Calvary's other arguments.

### A. Standard and Scope of Review

■ On appeal from the circuit court's order affirming a final administrative decision, this court reviews the administrative agency's decision and not the circuit court's determination. *XL Disposal Corp. v. Zehnder*, 304 Ill. App. 3d 202, 207, 709 N.E.2d 293, 297 (1999). Where resolution of the case requires determining the legal effect of a given set of facts, the agency's determination should be affirmed unless clearly erroneous. *XL Disposal*, 304 Ill. App. 3d at 207, 709 N.E.2d at 297. Here, although Calvary claims certain uses are religious and the Department disagrees, the determinative facts, *i.e.*, the actual uses to which the FARM was put, are not in dispute. The only issue is whether, given those facts, Calvary is entitled to a religious-use property tax exemption for the FARM. That issue requires this court to determine the legal effect of the given facts. That is, we must determine whether the primary use of the FARM was a religious use under the law. Accordingly, we will affirm the Department's determination that Calvary is not entitled to an exemption unless that determination is clearly erroneous. " '[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393, 763 N.E.2d 272, 280-81 (2001), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

### B. Religious-Use Exemption Turns on Property's Primary Use

■ Section 15—40 of the Property Tax Code (35 ILCS 200/15—40 (West 2002)) provides as follows: "Property used exclusively for *** religious purposes *** qualifies for exemption as long as it is not used

with a view to profit." The Supreme Court of Illinois "has long held that property satisfies the exclusive-use requirement of the property tax exemption statutes if it is *primarily* used for the exempted purpose; 'if property is devoted, in a primary sense, to a religious purpose, the fact that it is incidentally used for secular purposes will not destroy the exemption \*\*\*.' " (Emphasis in original.) *McKenzie v. Johnson*, 98 Ill. 2d 87, 98, 456 N.E.2d 73, 78 (1983), quoting *First Congregational Church v. Board of Review*, 254 Ill. 220, 224, 98 N.E. 275, 276 (1912). What constitutes use of property for a religious purpose has been narrowly confined to " 'a use of such property by a religious society or body of persons as a stated place for public worship, Sunday schools[,] and religious instruction.' " *Mount Calvary Baptist Church, Inc. v. Zehnder*, 302 Ill. App. 3d 661, 668, 706 N.E.2d 1008, 1013 (1998), quoting *Deutsche*, 249 Ill. at 136-37, 94 N.E. at 164. "However, generally, courts have employed a more liberal construction of the term 'religious purpose.' " *Mount Calvary Baptist Church*, 302 Ill. App. 3d at 668, 706 N.E.2d at 1013. The supreme court has stated that the *Deutsche* definition of "religious use" was not inclusive of everything that might in the future be regarded as a use for religious purposes but was merely illustrative of the nature of such use. *People ex rel. Carson v. Muldoon*, 306 Ill. 234, 238, 137 N.E. 863, 864 (1922), *overruled on other grounds by McKenzie*, 98 Ill. 2d at 99-100, 456 N.E.2d at 79; see also *Evangelical Teacher Training Ass'n v. Novak*, 118 Ill. App. 3d 21, 24, 454 N.E.2d 836, 838 (1983).

## C. Primary-Use Analysis

█ In *Fairview Haven v. Department of Revenue*, 153 Ill. App. 3d 763, 773, 506 N.E.2d 341, 348 (1987), this court stated that, "[i]n the tax context, the first amendment requires the court to accept the entity's characterization of its activities and beliefs as religious as long as the characterization is in good faith." This court quoted favorably from *In re Holy Spirit Ass'n for the Unification of World Christianity*, 55 N.Y.2d 512, 521, 435 N.E.2d 662, 665, 450 N.Y.S.2d 292, 295 (1982), in which the New York Court of Appeals stated as follows:

> "When, as here, particular purposes and activities of a religious organization are claimed to be other than religious, the civil authorities may engage in but two inquiries: Does the religious organization assert that the challenged purposes and activities are religious, and is that assertion bona fide? Neither the courts nor the administrative agencies \*\*\* may go behind the declared content of religious beliefs any more than they may examine into their validity."

This court held the format set forth in *Holy Spirit* is persuasive and has been followed. *Fairview Haven*, 153 Ill. App. 3d at 773, 506 N.E.2d at 348.

## D. Error in the Department's Analysis

■ In the instant case, the ALJ applied the wrong standard to determine whether Calvary put the FARM to use primarily for religious purposes. The ALJ stated as follows:

> "The applicant's minister believes that all activities performed on the subject parcel further the evangelism tenant [*sic*] and are therefore religious. This is not what Illinois law requires. While all the tenants [*sic*] help further the applicant's purpose, for property tax exemptions the Illinois courts and statutes have espoused a much more restrictive definition of what is a religious use of a piece of property."

The ALJ then quoted the *Deutsche* test in her recommendation for disposition and stated: "The subject property is used for a number of purposes, including recreational and social activities *unrelated to religious instruction or public worship*." (Emphasis added.) The "much more restrictive" standard applied by the ALJ has been rejected by Illinois courts. See, *e.g., People ex rel. Pearsall v. Catholic Bishop,* 311 Ill. 11, 17, 142 N.E. 520, 522 (1924); *Mount Calvary Baptist Church,* 302 Ill. App. 3d at 668, 706 N.E.2d at 1013; *Novak,* 118 Ill. App. 3d at 24, 454 N.E.2d at 838.

The Department argues the ALJ "did not state that the property could only be considered exempt if it was used for one of the three purposes listed in [*Deutsche*]" but merely found that the evidence failed to support Calvary's contention that the property was used primarily for Bible study, Sunday school, and devotional purposes. We disagree. Although the ALJ impliedly recognized that Calvary characterizes activities other than religious instruction or worship as religious ("all the tenants [(*sic*), including evangelism,] help further the applicant's [religious] purpose"), the ALJ failed to make a finding whether the FARM was used *primarily* for Calvary's stated religious purpose as a location to facilitate fellowship and evangelism. This, absent evidence suggesting Calvary's characterization was in bad faith, would have been a proper inquiry. See *Lutheran Church of the Good Shepherd v. Department of Revenue,* 316 Ill. App. 3d 828, 832-33, 737 N.E.2d 1075, 1078-79 (2000) (where church planned to use land as extension of existing yard, use presumed religious and "issue [was] whether the property was *actually being used* for exempt purposes" (emphasis in original)), citing *Catholic Bishop,* 311 Ill. 11, 142 N.E. 520.

The dissent argues "[t]his court is substituting its position for that of the ALJ and the Department." 349 Ill. App. 3d at 336. (McCullough, J., dissenting). This is not the case. The ALJ applied the incorrect legal standard to the facts of the case. The plain language of the

recommendation indicates the ALJ considered only whether the property was used for religious instruction or public worship. The ALJ's inquiry was consistent with the narrow *Deutsche* standard that has been rejected by our supreme court. Under *Fairview Haven*, 153 Ill. App. 3d at 773, 506 N.E.2d at 348, "[f]irst, the court must accept the organization's characterization of the purpose of its activities and, second, determine whether the property is in fact exclusively[, *i.e.*, primarily (see *McKenzie*, 98 Ill. 2d at 98, 456 N.E.2d at 78),] used for the religious purposes." The dissent mischaracterizes this statement as suggesting "that 'good faith' rather than 'exclusive use' " is the standard. 349 Ill. App. 3d at 336 (McCullough, J., dissenting). However, the "good faith" standard would only be applied to the entity's characterization of its activities and beliefs as religious. If the entity's characterization that the use to which the land is being put is a religious use is in good faith, a determination is still required that the land is put to that use exclusively (*i.e.*, primarily). Moreover, we do not "assume the burden to be the fact finder" as the dissent states. 349 Ill. App. 3d at 335 (McCullough, J., dissenting). The dissent argues that the ALJ's findings of fact "clearly support" its order. 349 Ill. App. 3d at 336 (McCullough, J., dissenting). However, we again note those facts were analyzed under the wrong legal standard.

Based on those facts as found by the ALJ, we hold the FARM *is* used primarily for religious purposes, specifically those being religious instruction (Bible study), fellowship, and evangelism. Under *Fairview Haven*, this court must accept Calvary's contention that fellowship and evangelism are tenets of its faith. The FARM *is* clearly used *to* allow Calvary's *members* to pursue this aspect of their beliefs. That use of the FARM is limited to Calvary's members, their friends, and other churches is sufficient evidence to establish that the FARM's primary use is religious. Even were this court to find the occasional shower or birthday party to be purely secular, those activities do not destroy the religious-use nature of the FARM evidenced by multiple weekly Bible studies and regular church activities, including those "recreational" outings put on by Calvary or its neighbor churches. See *McKenzie*, 98 Ill. 2d at 98, 456 N.E.2d at 78 (incidental use for secular purpose will not destroy the exemption); *Catholic Bishop*, 311 Ill. at 17, 142 N.E. at 522 (areas on grounds of Catholic seminary "used exclusively for recreational purposes by the school" entitled to exemption); *Lutheran Church of the Good Shepherd*, 316 Ill. App. 3d at 832-33, 737 N.E.2d at 1078-79, citing *Catholic Bishop*, 311 Ill. 11, 142 N.E. 520 (use of land as playground or picnic area or for other recreational activities presumed *to* qualify as a religious purpose where issue was whether land was actually being used for exempt purpose).

## III. CONCLUSION

Calvary is entitled to a religious-use exemption for the subject property. Accordingly, we need not determine whether it is entitled to a partial exemption or whether denial of the requested tax exemption violates the Religious Freedom Restoration Act. For the reasons stated, we reverse the circuit court's judgment.

Reversed.

JUSTICE APPLETON, specially concurring:

I concur with the result reached by the majority but write separately to identify concerns with the application of the nearly century-old definition of religious purpose enunciated by the Supreme Court of Illinois in *People ex rel. McCullough v. Deutsche Evangelisch Lutherische Jehovah Gemeinde Ungeaenderter Augsburgischer Confession*, 249 Ill. 132, 94 N.E. 162 (1911). This definition, relied upon by the Department to the exclusion of all other views, provided that religious purpose of property means use by a religious body as a stated place for public worship, Sunday schools, and religious instruction.

That definition, enunciated at the dawn of the twentieth century, does not encompass all of the uses to which modern church buildings are put. How does one characterize the use of a church basement for a postfuneral luncheon? How does one accommodate the use of a parish hall for a wedding reception following the ceremony in the church? What is the effect of the inclusion of a "gymnasium" in many modern church buildings? I would argue that the Department cannot rest so heavily on the *Deutsche* formula without broadening its view as to what constitutes a religious purpose.

Of even greater concern is the broadening definition of religion in the more evangelical of our churches where fellowship is as much a component of the religious experience afforded a church's congregants as a formal service. Such experiences are not merely a by-product or benefit of church membership. They are, instead, central to the everyday expression of faith in the community.

The Department is correct to be wary of many "nontraditional" uses of property in the guise of religion. However, it must be very careful in drawing lines at the appropriate places. The Supreme Court has said:

> "Governments have not always been tolerant of religious activity, and hostility toward religion has taken many shapes and forms—economic, political, and sometimes harshly oppressive. Grants of exemption historically reflect the concern of authors of constitutions and statutes as to the latent dangers inherent in the imposi-

tion of property taxes; exemption constitutes a reasonable and balanced attempt to guard against those dangers." *Walz v. Tax Comm'n*, 397 U.S. 664, 673, 25 L. Ed. 2d 697, 704, 90 S. Ct. 1409, 1413 (1970).

Our constitution provides that the General Assembly may exclude from real estate taxation property used for a religious purpose. Ill. Const. 1970, art. IX, § 6. It has done so by use of the language cited in the majority opinion. While I agree that the *Deutsche* tests are not exclusive, the Department, as an agency of the State of Illinois, cannot by its decision restrict religious expression by fiat.

JUSTICE McCULLOUGH, dissenting:

I respectfully dissent from the majority opinion.

Article IX, section 6, of the Illinois Constitution of 1970 provides in part as follows:

"The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery[,] and charitable purposes." Ill. Const. 1970, art. IX, § 6.

In conjunction with the above provision of the constitution, the legislature has passed section 15—40 (35 ILCS 200/15—40 (West 2002)), which provides:

"Religious purposes, orphanages, or school and religious purposes.

(a) Property used exclusively for:
(1) religious purposes, or
(2) school and religious purposes, or
(3) orphanages

qualifies for exemption as long as it is not used with a view to profit."

It is also important to note that when a statute purports to grant an exemption from taxation, the tax exemption provision is to be construed strictly against the one who asserts the claim of exemption. *International College of Surgeons v. Brenza*, 8 Ill. 2d 141, 145, 133 N.E.2d 269, 271-72 (1956). Likewise, as stated in *People ex rel. Goodman v. University of Illinois Foundation*, 388 Ill. 363, 370, 58 N.E.2d 33, 37 (1944), whenever a doubt arises, it is to be resolved against exemption and in favor of taxation.

The determination of whether the property should be declared to be tax exempt as used exclusively for religious purposes is a question of fact to be determined by the ALJ. We should not assume the burden to be the fact finder. This decision is best left to the ALJ and the

Department with its expertise. This court is substituting its position for that of the ALJ and the Department.

The ALJ, in paragraphs 9 and 10 of her decision, sets forth the facts with respect to the use of the property. Those findings clearly support the ALJ's and the Department's order. It should be noted that the appellant never asked for a partial exemption. The State offered the applicant the opportunity to apply for a partial exemption and the offer was refused. The ALJ also recognized that the applicant could have applied for a partial exemption. I suggest that the applicant is still not foreclosed from filing another claim for a partial exemption.

The majority gives credence to the statement in *Fairview Haven*, 153 Ill. App. 3d at 773, 506 N.E.2d at 348, that the court is required "to accept the entity's characterization of its activities and beliefs as religious as long as the characterization is in good faith." See 349 Ill. App. 3d at 331. The statement suggests that "good faith" rather than "exclusive use" is the standard. In this state, where real property taxes are one of the primary revenue-generating resources, strict adherence to the constitutional and statutory mandate is vitally important. To erode the tax base on the standard of good faith will simply make the burden on the property taxpayer more distasteful.

The judgment of the circuit court should be affirmed.