NO. 4-07-0199          Filed 2/7/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| FAITH BUILDERS CHURCH, INC., | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| THE DEPARTMENT OF REVENUE OF THE STATE | ) | No. 05MR158 |
| OF ILLINOIS, | ) | |
| Defendant-Appellant. | ) | Honorable |
| | ) | Leslie J. Graves, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE APPLETON delivered the opinion of the court:

In this action for administrative review, the circuit court reversed the decision of defendant, the Illinois Department of Revenue, to deny an exemption from property taxes for Heartland Childcare Center and Heartland Preschool. The Department appeals. We conclude that the Department's findings are not against the manifest weight of the evidence. The Department could reasonably find that, in practical reality, the primary use of the child-care center and preschool was as a day care and that the religious purposes of evangelism and theological instruction were secondary. The Department could also reasonably find that the child-care center and preschool were not exempt as "schools" because neither of them offered an established, commonly accepted program of academic instruction. Therefore, we reverse the circuit court's judgment.

I. BACKGROUND

As the State stipulated in the administrative hearing, Faith Builders is a

religious organization. It is a typical church, which holds services twice a week. The federal government considers it to be a nonprofit organization organized and operated exclusively for religious purposes pursuant to section 501(c)(3) of the Internal Revenue Code (26 U.S.C. §501(c)(3) (2000)).

One of those religious purposes is to spread the teachings of Christianity. To that end, Faith Builders bought a building in Charleston, Illinois, from Building Blocks Daycare and, with the 50 children it "inherited" from Building Blocks, started a combined child-care center, preschool, kindergarten, and school. Soon the number of children increased to 168.

Faith Builders has "Bylaws Governing the Operation of Christian Schools," and under these bylaws, all of the children, even those in day care, are to undergo religious instruction. The bylaws provide as follows:

"[T]he purpose of [Faith Builders] is to promote Christian education of high academic quality and child[-]care services *** by providing facilities for supplementing the financial needs of the Heartland [S]chools[,] comprised of Heartland Childcare Center, Heartland Preschool and Kindergarten, Heartland Academy, and Camp Heartland. The teaching of the Christian faith from God's Word is not just a separate subject in the curriculum, but is incorporated into every aspect of the total education and child[-]care program."

Heartland Childcare Center occupies approximately half of the building.

Heartland Preschool and Kindergarten and Heartland Academy occupy the other half. Camp Heartland uses some of the prekindergarten rooms, but the record does not specify which of the prekindergarten rooms the camp uses and how often it uses them.

To satisfy the Department of Children and Family Services, Faith Builders calls half of its building a "childcare center," but Faith Builders considers the infants, toddlers, and preschoolers to be just as much in "school" as the older children. In the administrative hearing, Faith Builders called its senior pastor, Steve McCann, as a witness. He testified that Heartland Schools provides religious instruction even to the six-week-old children: "[t]hey may not be able to read the scriptures; but, instead of just showing them a Sesame Street video or telling them a nice story[,] we *** use Bible stories and Bible scriptures and *** children's Christian material." Faith Builders also called Patricia Yow, the superintendent of education at Heartland Schools. She testified the school was established to fulfill the scriptural command "to teach the Bible to children when they sit, when they stand, when they rise up[,] and when they lie down"--"children," in this context, meaning children of all ages.

The attorney for Faith Builders asked Yow to "elaborate on *** the teaching of these Bible stories [to children six weeks to nine months old]." She answered:

> "They will *** s[i]t with the child on their lap. They will read
> a story from a Bible--and sometimes there are CDs that go
> along with it, that they hear the music and they hear the
> stories. Those can be played during the time when the

children are doing other things.  They can be takin[g] a bottle or whatever.  But there's Christian music playing in the background.  *** Bible stories *** are played.  We also have a program called [']Baby Einstein['], which shows some videos.  It has nothing to do with Christianity, but it has to do with *** the activities that are important to their development at that age.

Q. So there's religious instruction even for infants?

A. Yes."

Regardless of the child's age, Faith Builders required the parent to sign a document stating, "I understand that Heartland Schools will be teaching developmentally appropriate Christian principles to my child."

It is evident, from the direction of the testimony, that one of the major factual issues in the administrative hearing was as follows:  Given the standard of "developmental[] appropriate[ness]," how much religious instruction did infants, toddlers, and preschoolers actually receive in the course of a day, as opposed to the more mundane services of day care?  According to the Parent Handbook, "[t]hough much of the infant[']s and toddler[']s learning and play is self-directed and [self-] motivated, the staff interacts with and stimulates the child's learning through varied activities and experiences."  The handbook thereafter lists 11 such "activities and experiences"–for example, "learning to sit, crawl, roll, walk, and other movement activities" and "[a]ttending to the physical needs and hygiene of the children."  Religion

appears only once in this list: "[s]imple Bible and children stories, games, fingerplays, music, songs, movements, and sounds will be incorporated into the daily routine." The administrative law judge (ALJ) concluded that although Heartland Childcare Center and Heartland Preschool had "religious overtones," they were used primarily as a day care and, therefore, the portions of the building devoted to those programs should be subject to a property tax.

The ALJ found the day-care center and preschool to be taxable for an additional reason: they were "operated with a view to profit[,] as evidenced by the fees charged, the punitive late payments, and the severe penalties for picking up a child after [6 p.m.]." Faith Builders charged tuition of $75 per week, the purpose of which was to "reserv[e] a space" for the child. The parents had to pay the same amount of tuition on the first day of the week, regardless of the child's attendance. For Heartland Childcare Center and Heartland Preschool and Kindergarten, there was a penalty of $5 for each day the tuition was late, and if the tuition and penalties were not paid by the end of the week, the child was discharged, and the "space" was reserved for another child. If parents failed to pick up the child on time, there was a $5 penalty for each 15-minute period after 6 p.m. These penalties were inapplicable to Heartland Academy (consisting of grades 1 through 12).

Because the kindergarten and academy used curricula from Accelerated Christian Education of Texas, which corresponded to public-school curricula, the ALJ found they were used exclusively for "school and religious purposes" and, accordingly, recommended that the portion of the building devoted to those programs be exempt

from property taxes. The ALJ recommended that the rest of the building, housing the child-care center and preschool, be taxed. The Director adopted the ALJ's recommended decision.

The circuit court reversed the denial of the exemption for Heartland Childcare Center and Heartland Preschool, finding the Director's decision, in that respect, to be "clearly erroneous, arbitrary[,] and capricious[,] given the undisputed facts shown in the record and based upon the law applicable to these issues." The court's order further reads as follows:

"The [c]ourt finds based on the evidence that [p]laintiff is entitled to the tax exemption claimed because [p]laintiff's pre[]school it [sic] is used primarily for religious and/or school and religious purposes. Calvary Baptist Church of Tilton v. Department of Revenue, 349 Ill. App. 3d 325 (2004). The [c]ourt finds, based on the evidence, that [p]laintiff is entitled to the tax exemption claimed because [p]laintiff's pre[]school is a not-for-profit school. The [ALJ's] finding to the contrary being [sic] unsupported by the evidence and the [c]ourt notes that argument was not even being urged by the [d]efendant at the administrative hearing. The [c]ourt finds, based on the evidence, that [p]laintiff is entitled to the tax exemption claimed because [p]laintiff's pre[]school due to its educational purpose, the

- 6 -

evidence being uncontradicted as to the academic program being followed, even for the youngest students, and the [p]laintiff sparing the State the expense of paying for Pre-K education which it would be required to do if the parents elected to pursue the State-sponsored Pre-K education, of which the [c]ourt takes judicial notice."

This appeal followed.

## II. ANALYSIS

### A. Standards of Review

#### 1. Statutory Interpretation

Article IX, section 6, of the Illinois Constitution provides: "The General Assembly by law may exempt from taxation only *** property used *** for school, religious, cemetery[,] and charitable purposes." Ill. Const. 1970, art. IX, §6. Thus, statutory law controls the exemption of property from taxation (subject, of course, to the categorical limitations of article IX, section 6).

We interpret statutes de novo (In re Application of the County Treasurer, 347 Ill. App. 3d 769, 775, 807 N.E.2d 1042, 1048 (2004)), and when interpreting statutes exempting certain property from taxation, we construe the exemptions narrowly (Swank v. Department of Revenue, 336 Ill. App. 3d 851, 855, 785 N.E.2d 204, 207 (2003)). "'Taxation is the rule[;] tax exemption is the exception.'" City of Chicago v. Illinois Department of Revenue, 147 Ill. 2d 484, 491, 590 N.E.2d 478, 481 (1992), quoting Rogers Park Post No. 108, the American Legion, Department of Illinois v.

Brenza, 8 Ill. 2d 286, 290, 134 N.E.2d 292, 295 (1956).

## 2. Pure Questions of Fact

Section 8-40 of the Property Tax Code (Code) provides that judicial review of the Department's decisions shall be in accordance with the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2006)). 35 ILCS 200/8-40 (West 2006). Section 3-110 of the Administrative Review Law says: "The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2006). Courts interpret section 3-110 as meaning that an agency's findings of fact will stand unless they are against the manifest weight of the evidence. Eden Retirement Center, Inc. v. Department of Revenue, 213 Ill. 2d 273, 284, 821 N.E.2d 240, 246 (2004). "Against the manifest weight of the evidence" means the record clearly requires the opposite finding or, in other words, the agency's finding is arbitrary, unreasonable, or not based on the evidence. Farmers Automobile Insurance Ass'n v. Gitelson, 344 Ill. App. 3d 888, 892, 801 N.E.2d 1064, 1067-68 (2003).

In reviewing the agency's decision, we will keep in mind that the agency has a duty to resolve all debatable questions in favor of taxation, as do we. See Rogers Park Post No. 108, 8 Ill. 2d at 290, 134 N.E.2d at 295; Swank, 336 Ill. App. 3d at 856, 785 N.E.2d at 208. The party claiming the exemption has the burden of proving the entitlement thereto, and because any factual ambiguities will be resolved in favor of taxation, the proof necessarily must be clear and conclusive. Swank, 336 Ill. App. 3d at 855-56, 785 N.E.2d at 208.

### 3. Applying the Law to Undisputed Facts

The Department cites a decision by the Second District holding that if an agency applied the law to undisputed facts, courts should use a slightly deferential standard of review, reversing the decision only in cases of clear error. The Second District said: "Here, the Department's task was to apply a given legal standard to undisputed facts. Thus, the Department confronted a 'mixed question of law and fact,' and we must accept the Department's answer unless it is clearly erroneous." Cook Communications Ministries v. Department of Revenue, 345 Ill. App. 3d 753, 758, 803 N.E.2d 524, 528 (2004).

The supreme court, however, prescribes a de novo standard of review. Eleven months after the Second District decided Cook Communications, the supreme court held as follows: "[T]he Department's decision as to whether [the] plaintiff's property is exempt from taxation depends solely on the application of the appropriate legal standard to the undisputed facts, which is a question of law." Eden Retirement, 213 Ill. 2d at 284, 821 N.E.2d at 246; see also City of Chicago, 147 Ill. 2d at 491, 590 N.E.2d at 481. Obviously, the supreme court's holding must prevail over that of the Second District. To the extent that this appeal requires the application of legal principles to undisputed facts, our standard of review is de novo.

### B. The Scope of the Term "Religious Purposes"

Faith Builders claims an exemption under section 15-40(a) of the Code, which provides as follows:

"(a) Property used exclusively for:

(1) religious purposes, or

(2) school and religious purposes, or

(3) orphanages

qualifies for an exemption as long as it is not used with a

view to profit."  35 ILCS 200/15-40(a) (West 2006).

Courts interpret the term "exclusively," in the above-quoted statute, as meaning

"primarily" (McKenzie v. Johnson, 98 Ill. 2d 87, 98, 456 N.E.2d 73, 78 (1983)); an

incidental or secondary purpose, if not for profit, will not defeat the exemption (Board

of Education of Glen Ellyn Community Consolidated School District No. 89 v.

Department of Revenue, 356 Ill. App. 3d 165, 177, 825 N.E.2d 746, 757 (2005)).

The Department rejected Faith Builders' claim that the day-care center

and preschool were used primarily for "religious purposes."  Faith Builders contends

that the Department's decision is fatally flawed because the Department used too

narrow a definition of "religious purposes."  In her recommended decision (which the

Department adopted), the ALJ said:  "Applicant's religious argument fails because the

term [']religious purpose['] *** means the use of the property by a religious society or

body of persons as a place for public worship."  The ALJ cited People ex rel. McCullough

v. Deutsche Evangelisch Lutherische Jehovah Gemeinde Ungeaenderter

Augsburgischer Confession, 249 Ill. 132, 94 N.E. 162 (1911).  Actually, the supreme court

said in Deutsche Evangelisch:  "As applied to the uses of property, a religious purpose

means a use of such property by a religious society or body of persons as a stated place

for public worship, Sunday schools[,] and religious instruction."  Deutsche Evangelisch,

249 Ill. at 136-37, 94 N.E. at 165.  Since deciding <u>Deutsche Evangelisch</u>, the supreme court has explained that it did not intend the list therein to be exhaustive (<u>People ex rel. Carson v. Muldoon</u>, 306 Ill. 234, 238, 137 N.E. 863, 864 (1922), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>McKenzie</u>, 98 Ill. 2d at 99-100, 456 N.E.2d at 79), and courts have construed the term "religious purpose" more liberally (<u>Mount Calvary Baptist Church, Inc. v. Zehnder</u>, 302 Ill. App. 3d 661, 668, 706 N.E.2d 1008, 1013 (1998)).  For example, in <u>Calvary Baptist Church of Tilton v. Department of Revenue</u>, 349 Ill. App. 3d 325, 333, 812 N.E.2d 1, 7 (2004), we held that the term "religious purposes" included "fellowship and evangelism."

Even though the ALJ stated the definition of "religious purposes" in a way that was more restrictive even than <u>Deutsche Evangelisch</u>–saying it meant only the use of property for public worship--the ALJ evidently did not apply this overly restrictive definition, for she thereafter addressed Faith Builders' argument that the child-care center and preschool were part and parcel of a "religious school" rather than merely a day-care center ("Faith Builders uses the subject primarily as a day[-]care center for young children where fees are charged, rather than a religious school").  If, in the ALJ's view, the term "religious purposes" were confined to public worship and did not include religious schools, there would have been no point in deciding whether Faith Builders operated the child-care center and preschool primarily as a day care as opposed to a religious school.  Evidently, the ALJ assumed that "religious purposes" included religious instruction.  See <u>Evangelical Teacher Training Ass'n v. Novak</u>, 118 Ill. App. 3d 21, 26-27, 454 N.E.2d 836, 839-40 (1983).

## C. The Extent to Which the Child-Care Center and
## Preschool Were Used for "Religious Purposes"

In its bylaws and in the testimony of its witnesses, Faith Builders declared its purpose of instructing infants, toddlers, and preschoolers in the doctrines of Christianity and evangelizing them and their parents. The ALJ found no bad faith or pretense in this declaration of a religious purpose. Therefore, we accept Faith Builders' characterization of the purpose of its activities. See Fairview Haven v. Department of Revenue, 153 Ill. App. 3d 763, 773, 506 N.E.2d 341, 348 (1987). It is beyond dispute that, under the case law, religious instruction qualifies as a religious purpose. Evangelical Teacher Training Ass'n, 118 Ill. App. 3d at 26-27, 454 N.E.2d at 839-40; Deutsche Lutherisch, 249 Ill. at 136-37, 94 N.E. at 164.

Intentions, however, are not enough. We must ask whether, in actuality or practice, the building is used primarily for that religious purpose. See Fairview Haven, 153 Ill. App. 3d at 773, 506 N.E.2d at 348. More precisely, the Department asks that question--a purely factual question--and we ask whether the Department's answer is against the manifest weight of the evidence. A reasonable trier of fact would not necessarily have to find that Faith Builders uses its child-care center and preschool for the primary purpose of religious instruction. Infants, toddlers, and preschoolers have an extremely limited capacity for assimilating theological concepts. With children so young, the supervising adults' primary purpose, from 6 a.m. to 6 p.m., will inevitably be day care--and Faith Builders' descriptive literature reflects that reality. In a list of 11 tasks and activities, religion appears once. Arguably, that is because the children are simply too young for sustained religious instruction and their primary need is day care.

- 12 -

Faith Builders argues that its only reason for taking these children into its care is to spread the Gospel to them and their parents and, therefore, it uses Heartland Childcare Center and Heartland Preschool primarily for a religious purpose. A not-for-profit corporation made an analogous argument in Fairview Haven. In that case, the congregations of four Apostolic Christian churches organized Fairview Haven, consisting of independent-living apartments and intermediate-care rooms for the elderly. Fairview Haven, 153 Ill. App. 3d at 767, 506 N.E.2d at 343. The amended articles of incorporation stated that the purpose for which Fairview was organized was religious, charitable, and the care and keeping of elderly people. Fairview Haven, 153 Ill. App. 3d at 767, 506 N.E.2d at 343. Fairview argued that it used its facility primarily for a religious purpose because by caring for the elderly, it "implement[ed] the church's ministry by tying preaching to action. *** Christian service work [was] mandated by scripture." Fairview Haven, 153 Ill. App. 3d at 768-69, 506 N.E.2d at 345.

We held as follows:

"Here it is not contested that the operation of Fairview provided an opportunity for members of the Apostolic Christian faith to carry out Christian service work, care for the elderly, and engage in evangelization. However, operation of the nursing home was not necessary for these religious purposes, which could also have been accomplished through other means. (See generally Yakima First Baptist Homes, Inc. v. Gray (1973), 82 Wash. 2d 295,

- 13 -

510 P.2d 243; Christian Retirement Homes, Inc. v. Board of

Equalization (1970), 186 Neb. 11, 180 N.W.2d 136.) In

Yakima[,] the taxpayer argued that care of the aged was a

religious purpose. The court noted that the practice of

charity, kindness to other persons and in particular to the

aged, and the practice of all virtues are encouraged by

religious organizations; however, it cannot be stated that

they are religious purposes within commonly accepted

definitions of the word.

*** It is not contested that Fairview operated as a

not-for-profit business with a contract, requirements for

residency, provisions for payment, and provisions for

discharge. The corporate purpose included the care and

keeping of the elderly. Fairview's method of operation was

businesslike. The Department's determination based upon

the actual method of operation that Fairview was not exempt

for religious purposes was supported by the evidence."

Fairview Haven, 153 Ill. App. 3d at 774-75, 506 N.E.2d at

349.

In a sense, everything a deeply devout person does has a religious

purpose. But if that formulation determined the exemption from property taxes,

religious identity would effectively be the sole criterion. A church could open a

restaurant, for instance, and because waiters attempted to evangelize customers while taking their orders, the restaurant would be exempt. But the operation of a restaurant is not necessary for evangelism and religious instruction, although, like any other social activity, it can provide the occasion for those religious purposes. The same could be said of a day-care facility. Day care is simply not a "religious purpose" within the commonly accepted definition of that term.

The Department could reasonably find that the operation of Heartland Childcare Center and Heartland Preschool was businesslike and more characteristic of a commercial day care than a facility used primarily for religious purposes. Fifty of the children who were in Building Blocks stayed. Parents must pay weekly tuition to "reserve a space" for the child, and Faith Builders does not seem to care whether the child is in attendance as long as the tuition is paid. Faith Builders charges late fees and turns away the children of nonpaying parents ("you will be asked to withdraw your child from the center"). We do not question the economic or practical necessity of these measures, but they suggest a business relationship more than a religious one.

Just because Faith Builders charges tuition and fees to keep the doors open, it does not necessarily follow that it operates the child-care center and preschool "with a view to profit." See 35 ILCS 200/15-40(a) (West 2006). We do not reach the question of whether Faith Builders operates those programs "with a view to profit," for unless the property is "used exclusively for *** religious purposes," the absence of the profit motive is irrelevant. 35 ILCS 200/15-40(a) (West 2006). As we have held, the finding that the corresponding portions of the building are not used primarily for

religious purposes is not against the manifest weight of the evidence.

### D. The Claimed Exemption as a Not-for-Profit School

The Department granted an exemption for the kindergarten and Academy. Faith Builders wants to extend the exemption to the rest of the building, i.e., the child-care center and preschool. In addition to an exemption under section 15-40(a), Faith Builders argues the child-care center and preschool are exempt under section 15-35 of the Code, which provides as follows: "All property donated by the United States for school purposes, and all property of schools, not sold or leased or otherwise used with a view to profit, is exempt, whether owned by a resident or non[]resident of this State or by a corporation incorporated in any state of the United States." 35 ILCS 200/15-35 (West 2006).

Courts ask two questions when deciding whether property is a "school" for purposes of section 15-35. First, does the property "contain[] a school *** offer[ing] an established, commonly accepted program of academic instruction"? Chicago & Northeast Illinois District Council of Carpenters Apprentice & Trainee Program v. Department of Revenue, 293 Ill. App. 3d 600, 608, 688 N.E.2d 721, 726 (1997). "Under this standard, the courts have been inhospitable towards granting a school exemption to schools whose curriculum d[o] not consist of traditional subject matter common to accepted schools and institutions of learning ***." Chicago & Northeast, 293 Ill. App. 3d at 608, 688 N.E.2d at 727. Second, does "the program in question substantially lessen[] what would otherwise have been a governmental obligation, i.e., [would] the state [be] otherwise required to offer such a program of study in a tax-supported public

school"?  Chicago & Northeast, 293 Ill. App. 3d at 609, 688 N.E.2d at 727.  We do not reach the second question, for the record appears to contain no evidence that Heartland Childcare Center and Heartland Preschool offer curricula "consist[ing] of traditional subject matter common to accepted schools and institutions of learning."  Chicago & Northeast, 293 Ill. App. 3d at 608, 688 N.E.2d at 727.

### III. CONCLUSION

For the foregoing reasons, we reverse the circuit court's judgment.

Reversed.

McCULLOUGH and TURNER, JJ., concur.