NO. 4-10-0445      Opinion Filed 4/18/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

GRACE COMMUNITY CHURCH ASSEMBLIES OF ) Appeal from
GOD,                                  ) Circuit Court of
          Plaintiff-Appellee,         ) Sangamon County
          v.                          ) No. 08MR718
THE ILLINOIS DEPARTMENT OF REVENUE    )
and BRIAN A. HAMER, Director,         )
          Defendants-Appellants,      )
          and                         )
SANGAMON COUNTY, Acting Through JOHN  ) Honorable
SCHMIDT, State's Attorney,            ) Leo J. Zappa, Jr.,
          Defendant.                  ) Judge Presiding.
_____

          JUSTICE POPE delivered the judgment of the court, with
opinion.
          Presiding Justice Knecht and Justice Turner concurred
in the judgment and opinion.

**OPINION**

          For the 2007 tax year, an approximately seven-acre
parcel owned by plaintiff, Grace Community Church Assemblies of
God, was reassessed from agricultural to commercial property.
Consequently, plaintiff's property-tax liability rose from $60
per year to over $15,000 per year.  Plaintiff challenged the
assessment, claiming its property was exempt from taxation as it
was used exclusively for religious purposes.  The Sangamon County
board of review agreed with plaintiff and determined the property
should be exempt.  After review of the board's decision, defen-
dants, the Illinois Department of Revenue (Department) and its
Director, Brian A. Hamer, denied the exemption.  Plaintiff
requested a formal hearing.  After a hearing before an adminis-
trative law judge (ALJ), the ALJ recommended the exemption be

denied, and her determination was accepted by the Department and its Director. On administrative review, the circuit court reversed, finding the property was exempt.

The Department and its Director appeal, arguing the agency determination the property was not exempt should be upheld and the circuit court's judgment reversed. Specifically, these defendants argue (1) plaintiff submitted insufficient evidence its land qualified for exemption and (2) the evidence actually submitted shows plaintiff's land is not entitled to exemption. Plaintiff responds its land should be found exempt because either (1) the land was actually used exclusively for religious purposes or (2) the land was being developed toward use for religious purposes. As the land in question was used exclusively for religious purposes, insofar as it was at least minimally used for religious purposes, was not used for secular purposes, and was in the actual process of development and adaptation for religious use in the tax year in question, we affirm.

## I. BACKGROUND

Plaintiff's land in question is approximately seven acres at the intersection of Westchester Boulevard and Chatham Road in Springfield, Illinois. In May 1996, plaintiff acquired the parcel by quitclaim deed from the Illinois District Council of the Assemblies of God. Until tax year 2007, the parcel was assessed as agricultural land for property-tax purposes as approximately four of the seven acres were farmed by a nearby farmer. In 2005, this agricultural use ceased when plaintiff

sold off approximately one acre of the parcel. For tax year 2007, the parcel was reassessed as commercial property. This resulted in an increase in plaintiff's annual property-tax liability from $60 to more than $15,000. Plaintiff's budget could not cover the increased liability.

In May 2007, plaintiff's pastor, Danny L. Shaner, sent a letter to taxing authorities listing plaintiff's activities on the property in question. The activities listed are: "Services"; "Prayer Walks"; "Youth activities: Camping, launching rockets, observing the wildlife, various sports/games"; "Picnics/Fellowship meals"; "Kid's Day (outreach into the neighborhood)"; "Work day"; "School Supplies/Free Lunch outreach"; and "Use of property (no charge) to other nonprofit groups (Sojourn Shelter)." In June 2007, plaintiff applied for a religious exemption for the property taxes sought to be collected with the Sangamon County board of review. Later that month, the board of review recommended the exemption be granted.

After the board of review made its recommendation, as a matter of course, the Department inquired into plaintiff's use of the land in question. Specifically, the Department requested plaintiff (1) submit a list of all activities that took place on the property after January 1, 2007, (2) describe where the property was located in relation to the church, and (3) indicate whether the property was "the location for the new church in the floor plans submitted with the application." In September 2007, plaintiff responded to the Department's inquiry. In response to

- 3 -

the Department's first request, plaintiff stated "[t]here is only a small shed for maintenance equipment on the property" and listed 12 specific dates between January and September 2007 on which the property was used other than for storage. According to plaintiff, the property was used for eight prayer walks with participation by Pastor Shaner and, variously, plaintiff's "leadership," the "Capitol section leadership," and plaintiff's congregation. The property was also used for three "leadership meeting[s]," a "sectional meeting," three "property development meeting[s]," and a "leadership and maintenance training." In response to the Department's second request, plaintiff stated it was "presently" meeting for church services at the Illinois Retired Teacher's Association building on North Walnut Street. In response to the Department's third request, plaintiff stated the property in question was intended to be the site of the new church. Specifically, plaintiff responded, "We would like construction to begin as soon as possible, sometime late in 2008 is our best hope. We cannot begin until the tax issue is re-solved and won't begin until we can build debt free." In October 2007, the Department denied the exemption, finding "[t]he prop-erty is not in exempt use."

In December 2007, plaintiff requested a formal hearing with the Department on the exemption. In May 2008, the parties appeared at a hearing before an ALJ. On the Department's motion, the ALJ admitted a group of documents containing plaintiff's request for a formal hearing, the Department's denial of plain-

- 4 -

tiff's application for exemption, the board of review application and recommendation, the quitclaim deed by which plaintiff acquired the property, an "Affidavit of Purpose of Plat," an "Affidavit of Use" (plaintiff's response to the Department's request for further information), plaintiff's constitution and bylaws, a 2006 notification from the Department of plaintiff's exemption from sales and use taxes, Pastor Shaner's May 2007 letter listing uses of the property, and a photograph of the property.

In relevant part, plaintiff's constitution states plaintiff's purpose is "[t]o conduct, in a Scriptural manner, the work of world-wide evangelism and discipleship in obedience to the command of the Lord Jesus." Under its constitution, plaintiff may "own, hold in trust, use, sell[,] convey, mortgage, lease or otherwise dispose of any real estate or chattels as may be necessary for the furtherance of its purposes." The constitution further sets forth procedural prerequisites to plaintiff's mortgaging real property.

Plaintiff's case at the hearing consisted relevantly of Pastor Shaner's testimony and a copy of blueprints for a new church facility, dated March 2000. Pastor Shaner testified he had worked as plaintiff's pastor since 1991. Until plaintiff acquired sole ownership of the property in 1996 by quitclaim deed, it was held jointly by plaintiff and the Illinois District Council of the Assemblies of God. The land at the intersection of Westchester Boulevard and Chatham Road was initially acquired

by the district council for no "purpose other than to construct a church at that corner." When Pastor Shaner began working for plaintiff, plaintiff had in place a three-phase, $3 million building plan for constructing a new church facility on the land in question. After plaintiff acquired sole ownership of the land, plaintiff scaled back its $3 million development plan to "a lot less than $3 million." Plaintiff maintained a "building fund that the people contribute to on a regular basis" but did not raise funds specifically for developing the new church facility for theological reasons. Plaintiff preferred, if possible, to build its new facilities without incurring any debt. Pastor Shaner testified, "It's not that we can't [borrow money for that purpose], but we don't want to make a payment where money can be better used somewhere else." There was no testimony to establish how much money had accumulated in the building fund.

Eventually, plaintiff engaged an architect to develop plans for the new church facility, which were drafted in March 2000. However, after a tornado struck plaintiff's land in 2006, plaintiff discovered these plans were obsolete and required revision. Pastor Shaner stated whether the architectural changes would be pursued depended on the exemption status of plaintiff's land. Until plaintiff could be certain of the land's status, the reassessment had "ground [development plans] to a halt." Plaintiff was "not prepared to be investing more finances into updating the blueprints" until its tax liability was determined.

The only improvement ever actually built on the land

was a shed used to store plaintiff's tractor, supplies, and records. Occasionally, church leadership met and Pastor Shaner did "some counseling" in the shed. This counseling was "sometimes [of] a religious nature." The shed was destroyed by the 2006 tornado, and "about everything" stored in the shed except the tractor was lost. The shed was rebuilt within days of the tornado.

In 2005, plaintiff sold approximately one acre of its land to Sojourn Shelter and Services, Inc. (Sojourn), a non-profit women's shelter for abused women and children. As a condition of the sale and of annexing plaintiff's land to the City of Springfield, plaintiff was required to construct a new sewer line. The construction of the sewer line cost between $18,000 and $20,000. In connection with the land sale and annexation, plaintiff incurred approximately $3,000 or $3,500 in legal fees. Thereafter the ground was not farmed and the assessment was changed from "agricultural" property to "commercial" property.

Pastor Shaner testified to various uses of the property. The property was used for some services and prayer walks, "free school supplies distributions with free lunch" for neighboring children, fund-raisers conducted by and for the benefit of Sojourn, and "boy youth groups *** that shoot rockets and set up camps and such as that." Aside from "the Sojourn activities," these were "activities of the church." Pastor Shaner also testified to the "incidental" use of the land by people who

"would stop out and, you know, meet and maybe have a lunch or talk and pray."  The property was never leased or used for profit or with a view to profit.

In September 2008, the ALJ issued a written recommendation that the Department deny plaintiff's religious exemption for 2007.  The ALJ noted plaintiff could demonstrate entitlement to the exemption by showing it actually either used or adapted and developed the property for an exempt purpose.  The ALJ concluded plaintiff failed to demonstrate its entitlement to the exemption by clear and convincing evidence because it "did not substantiate its oral evidence."  "Although documents are not necessary to verify every single activity that took place" on the land in question, the ALJ stated, "some substantiation is necessary to verify that the property was used primarily for religious purposes and not used with a view to profit."  The ALJ noted some documentary evidence such as the pastor's calendar, church newsletters, bulletins, minutes of meetings, or photographs is necessary to verify the property was primarily used for religious purposes.  Accordingly, the ALJ recommended upholding the Department's denial of the exemption.  In September 2008, the Department accepted the ALJ's recommendation to deny the exemption and, in November 2008, the Department adopted the ALJ's recommendation to deny plaintiff's October 2008 request for rehearing.

In December 2008, plaintiff filed a complaint against the Department and Sangamon County, acting through its State's Attorney, John Schmidt, for administrative review in the circuit

court.  In May 2010, the circuit court reversed the Department's decision, ordering it to grant plaintiff the requested exemption. Reaching the conclusion that the Department had erred, the court noted, "The unrebutted record establishes that the only use of the property in 2007 was for exempt use only.  The Plaintiff owner has made efforts at development although some time has passed between stages of adaptation."

This appeal followed.

## II. ANALYSIS

On appeal, defendants, the Department and its Director, argue the agency decision to deny the exemption should be upheld. They contend the ALJ did not err in concluding plaintiff failed to meet its burden of demonstrating its entitlement to the exemption by clear and convincing evidence.  Further, they contend the evidence shows plaintiff is not entitled to the exemption.  In response, plaintiff maintains its only use of the land was for exempt purposes and, alternatively, the land was being adapted and developed for exempt purposes.  We agree with plaintiff and affirm the circuit court's judgment.

## A. Standard of Review

On appeal, we review the Department's decision, not the circuit court's.  See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212, 886 N.E.2d 1011, 1019 (2008).  The scope of judicial review of administrative decisions "extend[s] to all questions of law and fact presented by the entire record before the court."  735 ILCS 5/3-110 (West

2008). A court may encounter three types of questions on administrative review of an agency decision: questions of fact, questions of law, and mixed questions of law and fact. *Cinkus*, 228 Ill. 2d at 210, 886 N.E.2d at 1018. Because an administrative agency's findings of fact are presumed true, "a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence." *Id.*; see also 735 ILCS 5/3-110 (West 2008) ("The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct."). "In contrast, an agency's decision on a question of law is not binding on a reviewing court," and we review such a decision *de novo*. *Cinkus*, 200 Ill. 2d at 210, 886 N.E.2d at 1018.

Mixed questions of law and fact "are questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is *** whether the rule of law as applied to the established facts is or is not violated." (Internal quotation marks omitted.) *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577, 839 N.E.2d 479, 485 (2005). Decisions of mixed questions of law and fact are reversible only if they are clearly erroneous. *Cinkus*, 228 Ill. 2d at 211, 886 N.E.2d at 1018. The clearly erroneous standard is "significantly deferential." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387, 925 N.E.2d 1131, 1143 (2010); see also *id.* at 387 n.9, 925 N.E.2d

- 10 -

at 1143 n.9 (courts accord deference to administrative decisions "in recognition of the fact that agencies make informed judgments on the issues based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent"). "A decision is 'clearly erroneous' when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577-78, 839 N.E.2d at 485. The case before us presents a mixed question of law and fact.

## B. Principles of Construction

Our construction and application of tax-exemption statutes are governed by long-standing principles. In general, all real property is subject to taxation unless exempt by statute and by the constitution. *Provena Covenant Medical Center*, 236 Ill. 2d at 388, 925 N.E.2d at 1143-44; see also *City of Chicago v. Illinois Department of Revenue*, 147 Ill. 2d 484, 491, 590 N.E.2d 478, 481 (1992) ("Taxation is the rule[;] tax exemption is the exception." (Internal quotation marks omitted.)) (quoting *Rogers Park Post No. 108 v. Brenza*, 8 Ill. 2d 286, 290, 134 N.E.2d 292, 295 (1956)). Accordingly, statutes granting tax exemptions are strictly construed in favor of taxation. *Provena Covenant Medical Center*, 236 Ill. 2d at 388, 925 N.E.2d at 1144; accord *Board of Certified Safety Professionals of the Americas, Inc. v. Johnson*, 112 Ill. 2d 542, 547, 494 N.E.2d 485, 488 (1986) (citing *Coyne Electrical School v. Paschen*, 12 Ill. 2d 387, 390,

146 N.E.2d 73, 75 (1957)).

A party claiming an exemption must demonstrate its entitlement to the exemption by clear and convincing evidence. *Provena Covenant Medical Center*, 236 Ill. 2d at 388, 925 N.E.2d at 1144. That is, such a party must prove the property in question falls within the terms of both the constitutional authorization and the exempting statute. *Id.* All questions of fact and "debatable questions" are resolved in favor of taxation. *Id.* (citing *Follett's Illinois Book & Supply Store, Inc. v. Isaacs*, 27 Ill. 2d 600, 606, 190 N.E.2d 324, 327 (1963)). "[E]very presumption is against the intention of the state to exempt property from taxation." *Provena Convenant Medical Center*, 236 Ill. 2d at 388, 925 N.E.2d at 1144 (citing *Reeser v. Koons*, 34 Ill. 2d 29, 36, 213 N.E.2d 561, 565 (1966)).

C. Religious Exemption, Generally

Exemption from taxation of property used exclusively for religious purposes is authorized by the Illinois Constitution of 1970. See Ill. Const. 1970, art. IX, §6 (authorizing the General Assembly to exempt from taxation property "used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes"). "While the General Assembly has no authority to grant exemptions beyond those authorized by [article IX,] section 6, [of the constitution,] it 'may place restrictions, limitations, and conditions on [property-tax] exemptions as may be proper.'" *Provena Covenant Medical Center*, 236 Ill. 2d at 390, 925 N.E.2d at 1145 (quoting

*North Shore Post No. 21 of the American Legion v. Korzen*, 38 Ill. 2d 231, 233, 230 N.E.2d 833, 835 (1967)).

Pursuant to this constitutional authority, section 15-40(a) of the Property Tax Code (Code) (35 ILCS 200/15-40(a) (West 2008)) exempts property used for religious purposes from taxation.  Section 15-40(a) provides, in pertinent part:

> "(a) Property used exclusively for:
>
> (1) religious purposes[] ***
>
> * * *
>
> qualifies for exemption as long as it is not used with a view to profit."  35 ILCS 200/15-40(a) (West 2008).

This case involves construction of "used exclusively" within the meaning of the exemption statute.

Initially, we note "exclusively" in the context of religious exemptions has consistently been interpreted to mean "primarily."  *Faith Builders Church, Inc. v. Department of Revenue*, 378 Ill. App. 3d 1037, 1043, 882 N.E.2d 1256, 1262 (2008).  Accordingly, "an incidental or secondary purpose, if not for profit, will not defeat the exemption."  *Id.*

The relevant question is "whether, in actuality or practice, the building is used primarily for a religious purpose."  *Provena Covenant Medical Center*, 236 Ill. 2d at 409, 925 N.E.2d at 1155.  This requires considering "the facts and circumstances regarding how the property is actually used."  *Id.*  Mere intention to use property exclusively for religious purposes is

- 13 -

insufficient to entail exemption. *Id.* Further, to qualify for exemption, it is insufficient for a taxpayer to show no use for nonexempt purposes occurred if the taxpayer does not show actual use for exempt purposes. See *Antioch Missionary Baptist Church v. Rosewell*, 119 Ill. App. 3d 981, 982, 457 N.E.2d 500, 501 (1983) (requiring "proof of actual use for [an exempt] purpose" to demonstrate entitlement to a religious exemption under a relevantly worded precursor statute (Ill. Rev. Stat. 1981, ch. 120, par. 500.2) (internal quotation marks omitted)); compare 35 ILCS 200/15-40(a) (West 2008) (beginning, "Property used exclusively for" religious purposes) with Ill. Rev. Stat. 1981, ch. 120, par. 500.2 (beginning, "All property used exclusively for religious purposes ***"). However, neither the exemption statute nor cases interpreting it have established a minimum required frequency of use for religious purposes.

In general, unused property cannot qualify for an exemption. See, *e.g.*, *Antioch Missionary Baptist Church*, 119 Ill. App. 3d at 982, 457 N.E.2d at 501 (denying religious exemption where property "was not used for any purpose but in fact was boarded up and vacant"). However, actual use of property for exempt purposes encompasses its adaptation and development for exempt purposes. That is, exemptions may be allowed "where property is in the actual process of development and adaptation for exempt use" even if no actual use for exempt purposes is shown. *Weslin Properties, Inc. v. Department of Revenue*, 157 Ill. App. 3d 580, 584, 510 N.E.2d 564, 567 (1987). The relevant

- 14 -

question is whether the taxpayer's activities "constituted development and adaptation for exempt use," in which case exemption is permitted, or the taxpayer "merely intended to develop the property for such use," in which case taxation is required. *Id.*

For example, in *Weslin Properties*, 157 Ill. App. 3d at 586, 510 N.E.2d at 568, the Second District allowed a charitable exemption for the site of construction of a charitable urgent-care facility where the "plaintiff proceeded quickly through the planning and design stages, expending large sums of money in the process." The court noted "the complexity of the architectural process of designing a site for a medical campus[] and of designing the buildings to be located thereon" and opined "it seem[ed] virtually impossible to begin construction immediately upon purchase of the land." *Id.* The court concluded the "plaintiff's activities in [the tax year for which the exemption was claimed] were clearly beyond mere intention to convert the property for an exempt use, and actually constituted development and adaptation for such use." *Id.*

Under the exception to the actual-use requirement for adaptation and development, courts evaluate the taxpayer's activities for reasonable diligence in light of practical considerations. See, *e.g.*, *id.* (noting "it seem[ed] virtually impossible to begin construction immediately upon purchase of the land" due to the complexity of the project). For example, in *In re Application of County Collector*, 48 Ill. App. 3d 572, 576, 581-

- 15 -

82, 362 N.E.2d 1335, 1338, 1342 (1977), the Cook County registrar of titles claimed a public-use exemption for tax year 1969 for property condemned for construction of a "massive highway project," a leg of the Dan Ryan Expressway. The land was condemned in 1967 and was being used as a highway "at least as early as the summer of 1973." *Id.* at 581, 362 N.E.2d at 1342. The First District took notice "of the fact that the construction of a major modern expressway, from its initial phases until completion, may require a number of years, and that in order to properly plan and carry out this construction it is necessary to acquire the needed land some time in advance." *Id.* The court noted, further, the condemned land's "eventual use as part of a completed highway may necessarily depend on its simply being available in an essentially dormant state for some period of time." *Id.* Accordingly, the court inferred such land, although not actually being used as a highway in 1969, "simply by virtue of its location and public ownership [was] in a very real sense in the actual process of development and adaptation for use by the public." (Internal quotation marks omitted.) *Id.* The court found the construction of the highway and the actual use of the land for a public purpose occurred "within a reasonable time" after the condemnation. *Id.* at 581-82, 362 N.E.2d at 1342. "In such a situation," the court concluded, "from the time the condemnor acquired possession of the property until its full development for highway purposes, that property was in the natural and necessary course of development and adaptation for

- 16 -

highway use."  (Internal quotation marks omitted.)  *Id.* at 582, 362 N.E.2d at 1342.  Accordingly, the court allowed the requested exemption.  *Id.*

### D. Exemption of Plaintiff's Land

The sole issue on appeal is whether plaintiff demonstrated it was entitled to exemption for the land in question for 2007.  This is a mixed question of law and fact as it required the Department to determine whether the facts in this case satisfied the statutory standard of exemption.  See *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577, 839 N.E.2d at 485 (quoted above).  Accordingly, we review the Department's decision on this issue for clear error.  We conclude the Department clearly erred.

Initially, the parties both assert our analysis should focus on plaintiff's activities *vis-a-vis* the land in question that occurred in 2007.  Such a limitation is advisable, particularly where plaintiff never intended to claim an exemption for religious purposes until 2007, when its annual tax liability rose dramatically and unexpectedly from $60, which plaintiff was willing and able to pay, to more than $15,000.  As noted above, this change resulted from the unanticipated reclassification of plaintiff's land from "agricultural" to "commercial" property. Plaintiff presented evidence it intended, from the time it acquired the land, to build a church there.  However, plaintiff did not apply for a religious exemption until the 2007 tax year. The plaintiff is not required to show either actual use of its

land for religious purposes or development and adaptation for such use in years for which it chose not to claim a religious exemption.

As a result of this limitation on our focus, we will not consider plaintiff's pre- or post-2007 activities. On one hand, this means our analysis is not affected by the circumstances of plaintiff's acquisition of the land, sale of a portion thereof to Sojourn, annexation of the land to Springfield, or extension of gas and sewer lines to the land. Further, plaintiff's obtaining blueprints for its prospective church building in 2000 is relevant to our analysis only insofar as its possession of those plans in 2007 affects the amount of work yet required to carry out the development and adaptation of the land for religious use as plaintiff intended in 2007. On the other hand, we will not hold the lapse of time between 1996, when plaintiff acquired sole ownership of the land, and 2007, when the intended church facility had yet to be constructed, against plaintiff as evidence of its mere intention to establish a religious use of the land.

Having defined the scope of our inquiry, we note the evidence presented in the record on appeal is remarkably scant. For instance, there is no evidence of the amount of money in plaintiff's building fund or the amount raised for that fund in 2007. Nor is there evidence of plaintiff's budget for the proposed construction. Further, the evidence regarding plaintiff's activities in 2007 lacks specific potentially relevant

details, including the frequency of Pastor Shaner's religious counseling, the attendance figures and particular subject matters of the prayer walks and various meetings, and the discrete accomplishments of the property-development meetings. Nevertheless, sufficient evidence informs our conclusion plaintiff is entitled to a property-tax exemption for the land in question for the year 2007.

In 2007, plaintiff's property was actually used primarily for religious purposes. The evidence demonstrates plaintiff made *some* use of its land for religious purposes, which is sufficient to satisfy the actual-use requirement. Namely, plaintiff conducted church activities on the land on at least 12 specific occasions identified by Pastor Shaner. Further, the use by Sojourn, which Pastor Shaner distinguished from the "activities of the church," appears to have been less frequent and, thus, does not affect our conclusion the land was used primarily for religious purposes for two reasons. First, given the fellowship plaintiff developed with Sojourn, Sojourn's use arguably advanced plaintiff's religious purpose. Second, regardless of its religious or secular character, any such use was secondary to plaintiff's own use for religious purposes. Neither plaintiff nor any other organization used plaintiff's land for profit.

Further, plaintiff's land was in the actual process of development and adaptation for religious use within the meaning of that doctrine. Under *Application of County Collector*, a reasonable amount of time is allowed for development and adapta-

tion for exempt uses during which land may qualify for exemption even if vacant and dormant. What is reasonable is determined with respect to the particular circumstances of each case. In this case, in 2007, plaintiff's plan to construct a church facility on its land rose above a mere intention to develop.

Plaintiff held three property-development meetings in 2007. Although the specific substance of those meetings is not revealed by the record, we find this activity amounts to development and adaptation in light of plaintiff's financial situation and in consideration of the suddenness of its perceived need to qualify for a religious-use exemption in 2007. While the amount of money actually held by plaintiff for development is unknown, plaintiff presented evidence it did not have sufficient funds to cover its $15,000-plus property-tax liability for 2007 and it continued, in 2007, to segregate some of the monetary donations it received into a building fund. From this evidence, we infer plaintiff was financially unable at the time to undertake steps beyond mere planning and development meetings. Further, plaintiff's demand for a religious exemption was unforeseen. Under these circumstances, it was reasonable for plaintiff to proceed with the initial phases of development in the manner it employed.

Our conclusion depends on all of the specific circumstances of this case. We note these circumstances may change over time, even with respect to these same parties and this same parcel of land. The timing of plaintiff's activities in relation to its application for the religious exemption is essential to

our determination its development activities were reasonable. Further, our conclusion plaintiff is entitled to exemption for its land does not result solely from our consideration of either plaintiff's actual use or the steps it took toward development and adaptation. Rather, this conclusion is based on our consideration of the totality of the circumstances.

III. CONCLUSION

For the reasons stated, we affirm the circuit court's judgment reversing the Department's decision to deny the exemption.

Affirmed.