# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***Armenian Church of Lake Bluff v. Department of Revenue*, 2011 IL App (1st) 102249**

---

| | |
|---|---|
| Appellate Court Caption | ARMENIAN CHURCH OF LAKE BLUFF, Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE OF THE STATE OF ILLINOIS; BRIAN A. HAMER, Director, The Department of Revenue; KENNETH J. GALVIN, Administrative Law Judge; THE VILLAGE OF LAKE BLUFF; LAKE BLUFF ELEMENTARY SCHOOL DISTRICT 65; and THE LAKE COUNTY BOARD OF REVIEW, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2249 |
| Filed | July 22, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An administrative law judge's decision that plaintiff's property was not in an exempt ownership or an exempt use for purposes of real estate taxation was affirmed where the property was primarily used as a private residence, any religious services that occurred there were essentially for the residents and their family and friends, the decision was not improperly based on an analysis of religious doctrine, and the superseded decision of the Department of Revenue reversing its earlier grant of a religious-use real estate tax exemption while cross-motions were pending before the administrative law judge did not violate due process. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-26405; the Hon. Sanjay Tailor, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Wayne B. Giampietro, of Stitt, Klein, Daday, Aretos & Giampietro, LLC, and Poltrock & Giampietro, both of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Brian F. Barov, Assistant Attorney General, of counsel), for appellees.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Garcia and Justice R. Gordon concurred in the judgment and opinion.

## OPINION

¶ 1    The Department of Revenue of the State of Illinois granted the plaintiff property owner's application for a religious-use real estate tax exemption for the 2007 tax year, despite Lake County's recommendation that the application be denied. The Village of Lake Bluff and Lake Bluff Elementary School District 65 objected to the decision by seeking administrative review; however, while the review was pending, the Department issued a superseded, contrary decision. The administrative hearing officer subsequently also ruled against the exemption. The circuit court affirmed. In this appeal, the property owner contends the Department's superseded decision was an arbitrary denial of due process, the hearing officer's decision was improperly based on religious criteria, and the tax exemption should be granted either because the property was primarily used to conduct public religious worship services or because it was the site of a parsonage. See 35 ILCS 200/15-40(a), (b) (West 2006).

¶ 2    Our role is to review the administrative decision rather than the circuit court's decision. *Grace Community Church Assemblies of God v. Department of Revenue*, 409 Ill. App. 3d 480, 485 (2011). Here, where the historical facts are admitted or established and the rule of law is undisputed, we are resolving whether the facts satisfy a statutory standard for tax exemption. *Grace Community Church*, 409 Ill. App. 3d at 486 (2011). This is considered a mixed question of law and fact. *Grace Community Church*, 409 Ill. App. 3d at 486. Decisions on mixed questions of fact and law are reversible only if they are clearly erroneous, which is a " 'significantly deferential' " standard of review. *Grace Community Church*, 409 Ill. App. 3d at 486 (quoting *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387, 925 N.E.2d 1131, 1143 (2010)). We will set aside an administrative decision as clearly erroneous only when we are left with the definite and firm conviction that a mistake was made. *Grace Community Church*, 409 Ill. App. 3d at 486.

¶ 3    Taxation is the rule and tax exemption is the exception. *Provena Covenant*, 236 Ill. 2d at 388, 925 N.E.2d at 1143. Every presumption is against the intention of the state to exempt

property from taxation. *Provena Covenant*, 236 Ill. 2d at 388, 925 N.E.2d at 1144. Accordingly, statutes granting exemption are strictly construed in favor of taxation and questions of fact or "debatable" questions are similarly resolved in favor of taxation. *Provena Covenant*, 236 Ill. 2d at 388, 925 N.E.2d at 1144. Section 15-40(a) of the Illinois Property Tax Code exempts from taxation property which is "used exclusively" for "religious purposes." 35 ILCS 200/15-40(a) (West 2006). Section 15-40(b) exempts from taxation:

> "Property that is owned by
>
> > (1) churches or
> >
> > (2) religious institutions or
> >
> > (3) religious denominations
>
> and that is used in conjunction therewith as housing facilities provided for ministers \*\*\*, their spouses, children and domestic workers, performing the duties of their vocation as ministers at such churches or religious institutions or for such religious denominations \*\*\*.
>
> A parsonage, convent or monastery or other housing facility shall be considered under this Section to be exclusively used for religious purposes when the persons who perform religious related activities shall, as a condition of their employment or association, reside in the facility." 35 ILCS 200/15-40(b) (West 2006).

¶ 4    See, *e.g.*, *Our Savior Lutheran Church v. Department of Revenue*, 204 Ill. App. 3d 1055, 562 N.E.2d 1198 (1990) (parsonage and carport which were temporarily vacant after 40 years due to church pastor's retirement were still exempt from taxation); *Ada County Assessor v. Roman Catholic Diocese*, 849 P.2d 98 (Idaho 1993) (property occupied by semi-retired priest without a designated congregation and church officials who worked mainly as administrators without regular ministries did not qualify for parsonage exemption). Courts have interpreted the term "exclusively" in the context of religious exemptions to mean "primarily, and will not deem incidental or secondary use which is not for profit as grounds for denying exemption." *Grace Community Church*, 409 Ill. App. 3d at 488 (citing *Faith Builders Church, Inc. v. Department of Revenue*, 378 Ill. App. 3d 1037, 1043, 882 N.E.2d 1256, 1262 (2008) (finding church preschool was a daycare center instead of a facility used primarily for religious purposes)). There is no all-inclusive definition of religious purpose for tax cases and relevant considerations include facts and circumstances indicating how in actuality or practice the property is used. *Provena Covenant*, 236 Ill. 2d at 409, 925 N.E.2d at 1155.

¶ 5    The subject five-acre property at 1955 Shore Acres Road, Lake Bluff, Illinois, 60044 (Lake County PIN 12-09-401-002), was sold to Susan Michael for $3 million in October 2004, as a residence for herself, her husband George Michael, and their three daughters. George Michael has described Lake Bluff as a small community of about 7,500 people located north of Chicago, and the property itself as a heavily wooded, private and tranquil site which abuts the shores of Lake Michigan. At a deposition in 2008, Susan Michael stated she "really [did not] know" about the purchase, because her husband "handle[d] all" the family's property matters, including deeds, construction, mortgages, and taxes, and would obtain her signature on documents as needed. George Michael is a real estate broker and the president of Michael Realty L.L.C., a Chicago real estate brokerage that is devoted to selling,

leasing, and managing residential and commercial property. He is also the founder of Citizens Bank and Trust, which was chartered in January 2000, and is vice chair of its board of directors and chair of its audit committee. Although the Lake Bluff property was improved with a single-family dwelling, between 2004 and 2006, the Michaels performed significant demolition and construction which included remodeling the residence, building an addition with an indoor swimming pool and a two-story racquetball court, and installing an electric tram which facilitated access from the bluff at the edge of their property to the shore of Lake Michigan. Without the exemption at issue, their 2007 tax bill was $38,911.11.

¶ 6        The Michaels are second-generation Americans, their religious background is Armenian Orthodox, a Christian faith, and they are long-term parishioners of St. Gregory the Illuminator Armenian Church, which is situated at 6700 West Diversey Avenue in Chicago. However, Susan Michael found it daunting to continue traveling to St. Gregory after she moved from 1340 Longvalley Road in Glenview, Illinois, to the subject property in Lake Bluff in 2004, because she is physically limited by secondary progressive multiple sclerosis and advanced osteoarthritis.

¶ 7        On or about November 11, 2006, George Michael visited the Internet address spiritualhumanism.org, which is the website of a Pennsylvania nonprofit "humanist church" which does not have a physical location or "endorse christian theology" and offers instant, online ordination to those who "simply click[ ] the button" which reads "Ordain Me." Clicking "the button" is free, but those who remit $75 may "upgrade" their "official title" from "Ordained Clergy Person" to "a different title [of their choice] such as Reverend or Pastor." George Michael paid the upgrade fee and chose the title "Reverend."

¶ 8        On March 22, 2007, Susan Michael signed a quitclaim document conveying the entire subject property to a new corporation called Armenian Church of Lake Bluff. There was no consideration for the transfer in ownership. At a deposition in 2008, George Michael testified that his accountant, Marc Geissler, decided the property should be quitclaimed "to accomplish setting up and starting a church" "[f]or tax exemption purposes." Geissler became the treasurer of this new entity.

¶ 9        On November 20, 2007, Geissler completed an Illinois PTAX-300-R "Religious Application for Non-homestead Property Tax Exemption" form in the name of Armenian Church of Lake Bluff. Part 3 of the form asks the exemption applicant to: "Describe the specific activities that take place on this property (*i.e.*, housing facilities for minister or other similar official of a religious institution or religious denomination, public religious worship services or related functions, religious education and instruction, administrative support services.) Write the exact date each activity began, how frequently it takes place, and the hours during which the activity is held." Geissler completed this section with the statement: "Housing for a religious officer, administrative offices of the Church, M-F 9:00 a.m.–5:00 p.m., Religious Education Institution and worship times which vary. See attached Church Mission Statement." Geissler marked "yes" to the question "Is the minister or other official ordained, commissioned, licensed, or otherwise certified?" and "yes" to the question "Is the minister or other official required to reside in the property as a condition of employment or association?" Geissler described the main building on the property as a two-story "Rectory, Office, Education Fac., Cathedral" which occupied 14,294 square feet, and the secondary

building as a one-story detached garage.

¶ 10       After meeting on February 11, 2008, the Lake County board of review recommended that the Illinois Department of Revenue deny the application because the "[c]urrent use of the property does not satisfy the statutory requirements for an exemption for religious purposes."

¶ 11       The county board forwarded the application to the Department for disposition, and on May 15, 2008, the Department requested additional information to determine exemption eligibility, including (1) an affidavit regarding the use of the property as a church and parsonage and the date this use began, (2) pictures of the interior showing how it was being used, and (3) a copy of any weekly or monthly bulletin that had been published by the church.

¶ 12       The response consisted of George Michael's letter/affidavit dated May 27, 2008, three photographs, and church bulletins dated April 8, 2007, December 23, 2007, and April 20, 2008. In the letter/affidavit, George Michael swore the property "serves as both Church and Parsonage and was fully functional whereas all construction was completed." Also, "an initial ceremony of a home blessing was performed by members of the Armenian Archdiocese on March 22, 2007, as well as Father Vahran Hazarian, Father Aren Jebejian and Reverend George Michael," and "services have been held [at least monthly since that date]." He also swore that the property "serves as additional housing for clergymen Father Aren Jebejian and Reverend George Michael and family." He added that the "space is utilized in the Church as [a] Spiritual Study Room and in the future as a pre-school." The three photographs depict what appear to be a meeting room with two large tables flanked by folding chairs and a prominent cross on one wall and the exterior of a large brick building with a prominent cross to one side. The attached church bulletins were each two or three pages long, included details for a particular day's service, such as specific Bible passages to be read, and identified the "Readers" and the "Greeter" for that date. The bulletins also included a "prayer list" of about 25 "parishioners" described as being "ill, at home, in a hospital or nursing home" and concluded with a calendar of upcoming services.

¶ 13       On June 12, 2008, based on the documentation submitted, the Department issued a certificate approving the requested exemption for 78% of the 2007 assessment.

¶ 14       The village and school district protested and requested that the decision be reconsidered by an administrative law judge. They contended the property was not in exempt use, or, in the alternative, the claimed use was a zoning code violation which should not be rewarded with a tax exemption. In fact, on July 16, 2008, the village sued Armenian Church of Lake Bluff and the Michaels individually, alleging the subject property was zoned "Country Estate Residence District (C-E)," the Lake County zoning code did not permit church operations as of right within the district, the defendants had not applied for and been granted a special use permit, and the code violation subjected the defendants to fines accruing at the rate of $500 per day. This zoning violation action and the instant administrative review action proceeded concurrently.

¶ 15       In the administrative review action, the parties made use of interrogatories and depositions and agreed that in lieu of a hearing they would proceed with cross-motions for summary judgment.

¶ 16    Architect Harry B. Burroughs testified at deposition that he designed the Michaels' racquetball court, which was later designated as a chapel, and the artist's workshop, which was later called a pastor's study. The record indicates glass doors and overlooking windows allowed spectators to look into the racquetball court, but the Michaels filled the enclosed area with pews, folding chairs, books, artwork, and musical instruments. Burroughs did not think George Michael "ever played racquetball in his life" but had requested installation of a racquetball court "for possible resale" or was "like a lot of guys" who asked for things like indoor basketball courts that Burroughs thought did not get a lot of use. When Susan Michael expressed an interest in "creating space in the house where she could worship without having to travel," Burroughs suggested the addition of a walkway and separate entrance so the racquetball court could be used as a chapel. However, no special use permit had been issued to use the property for a church.

¶ 17    George Michael is the only person who has ever conducted worship services on the subject property. He testified that the reference to housing for a religious officer in the exemption application was a reference to housing for himself. Similarly, in answer to an interrogatory, he indicated his reason for stating/swearing on May 27, 2008 that the property served as a parsonage was that "Reverend George Michael resides at the subject property." The record lacks a completed parsonage questionnaire, and George Michael testified that he did not know if he had completed this additional form or ever been provided with one. He also testified that the reference to a "Religious Education Institution" on the exemption application was not a reference to any specific entity that he knew of, and that the term "religious education" meant reading from a Bible and study books, which his three children did on a daily basis. The accountant/church treasurer had written the exemption application and the church mission statement that was attached to it. Although the exemption application indicated "the minister [is] required to reside in the property as a condition of employment or association," George Michael testified that he was not employed by Armenian Church of Lake Bluff, that the church bylaws did not require him or anyone else to live on the property, and that he would live on the property even if the church was not there. He also testified that it is his "duty" to reside on the property so that he may "service the church and be there if necessary if people have questions or problems," and that by his "duty," he meant his "duty as a father, as a husband, as a reverend." George Michael sought online ordination through the Church of Spiritual Humanism because "it was a way to do it without having to go through the process of theological school and the years that are required." He does not hold himself out as an Armenian Orthodox priest. Father Aren Jebejian testified that the Armenian Church of North America is the governing body for churches of the Armenian faith in the United States; it is divided into two dioceses, one of which is the Eastern Diocese, which governs the establishment and operation of all Armenian churches in Illinois. The exemption applicant, Armenian Church of Lake Bluff, was never a part of the Armenian Church of North America, and there has been no communication with any members or representatives of the Eastern Diocese regarding the existence or operation of a church on the subject property.

¶ 18    In response to the Department's request for additional information supporting the application, George Michael stated/swore, "The property serves as additional housing for

clergyman Father Aren Jebejian and Reverend George Michael and family," and, in response to an interrogatory, he stated the property was being used as a parsonage for Father Jebejian. Also, the church bulletins submitted to the Department indicate that Father Jebejian led the church services conducted at the property on April 8, 2007, and Father Vahran Hazarian conducted church services there on December 23, 2007. However, Father Jebejian testified he was an ordained celibate priest within the Armenian Orthodox Church, he was a full-time employee of St. Gregory the Illuminator of Chicago, he was never employed by Armenian Church of Lake Bluff, he could not hold any position with that entity, and he could not perform any services on the subject property other than a home blessing. A home blessing is a five- to seven-minute ceremony in which a priest blesses bread, salt, and water in the home of a church parishioner, and this ritual had no connection to Armenian Church of Lake Bluff. Father Jebejian would conduct a blessing at the home of any Armenian Orthodox Church parishioner who asked him to do so. His predecessor at St. Gregory, Father Hazarian, had neither performed nor attended services on the property on December 23, 2007. Father Jebejian was residing in Elmwood Park, Illinois, and had resided there, except for a one-year sabbatical in Armenia, since moving to the Chicago area in 1998. Father Jebejian never claimed the subject property as his address or had his mail delivered there. He had been a guest at the property, as he had been guest at the homes of many other parishioners of St. Gregory.

¶ 19    In the zoning violation action, Armenian Church of Lake Bluff and the Michaels filed a verified answer on September 18, 2008, in which they denied "they are operating a 'Church' which is open for public worship services on the subject property." Instead:

> "The defendants affirmatively state that the principal use of the subject property is a single family dwelling which houses the defendant, George Michael, who is a licensed Reverend/Clergyman for the Armenian Church of Lake Bluff, and his wife, Susan Michael. The single family dwelling on the subject property includes a chapel which is utilized for private prayer and private worship services for the Reverend Michael, his family and close friends. The single family dwelling also includes a pastor's study. There is a room over the detached garage which is utilized for bible study and crafts. Although the property is owned by a religious institution and is utilized for private religious activities, the defendants deny that their use of the subject property requires a Special Use Permit for a 'Church.' "

¶ 20    The verified answer also contains the statements that the Village of Lake Bluff "has no authority to regulate private religious uses or functions that occur in a private chapel which is part of a residence," and "has no authority to require an owner or occupant of a private residence to obtain a Special Use Permit prior to holding private religious functions in their home." At his deposition with regard to the tax exemption, George Michael testified at his deposition that there was no signage for Armenian Church of Lake Bluff at the entrance to his residential subdivision. The church was open for public worship "if people choose"; however, people would know about the church by "word of mouth only," and only on one occasion had someone he did not know come to a service, but that was when his "brother brought a couple guys with him." The photograph of the exterior of the subject property which was submitted to the Department in support of the exemption application showed an

equal-sided cross installed prominently on an exterior wall; however, that cross had been drawn onto the photograph with a marker and did not physically exist at the time.

¶ 21    Teresa Wurster testified that she did office work for real estate agents including George Michael until she became disabled, and then she began volunteering at the Michael Realty office, where she helped the Michaels' disabled daughter, Dorothy, with her college course work and also occasionally answered the office telephones or made photocopies. Wurster was not Armenian, was not normally a churchgoer, and had never joined a church, but she attended services at Armenian Church of Lake Bluff because she knew religion was comforting to Susan. The services were attended by "friends, family," "[t]hat's it." She had never seen the church mission statement and knew nothing about the special needs youth organization or endowment. She disagreed with George Michael's completed "Affidavit of Organization" indicating church members met at the Lake Bluff property on January 9, 2007, to elect officers, because she had volunteered for her role, and she identified her fellow officers as follows: Liberty "Libby" Baronian was Susan's aunt; she met George's brother Robert "on maybe one or two occasions"; she met Steve R. Nichols "maybe once"; she met Farther Aren D. Jebejian at the house because "he is very close to Susie"; she was unsure about ever meeting Marc Geissler but thought "he might be the CPA"; she had seen Vince Pelini, his wife, and their two children a couple of times; Charles Bosko worked for the realty office or the Michaels and would drive her to the office and the Lake Bluff property; and Simonida "Mona" Jovanovic had been Bosko's girlfriend but they were no longer a couple. When shown a copy of the church bylaws purportedly adopted on March 6, 2007, Wurster said she had not read them "all the way through," she could not recall convening with the other signators to adopt the bylaws, "If it was considered to be a meeting, they weren't all there [at the Michael Realty office at the same time]," "This was supposed to be a discussion, but this was actually handed to me by George," and she had not appeared before a notary. She had not heard about a home blessing which took place on March 22, 2007, but that "had nothing to do with the church." Wurster and Dorothy prepared the church bulletins by copying bulletins from the St. Gregory's website and then editing the contents. For instance, under the heading "Prayers for the Sick," St. Gregory listed three columns of names which Wurster and Dorothy copied verbatim because "those people were likely to be acquaintances of the Michaels from their time at St. Gregory's." A reference to a meeting of the women's guild was a reference to Wurster and Dorothy having lunch and preparing the bulletin. They also copied the sentence, "Fr. Aren & the Women's Guild wish to thank all who donated and colored Easter Eggs," as a reference to Wurster and Dorothy coloring eggs with Georgeann and Annie and they put this sentence in their bulletin because "You got to fill in some space. Otherwise, you got a one-page bulletin."

¶ 22    On April 21, 2009, the Department of Revenue issued a superseded certificate regarding the application for a religious-use property tax exemption, in which it stated the request was denied because "[p]roperty not in exempt ownership," and "[p]roperty not in exempt use." See 35 ILCS 200/15-25 (West 2008) (indicating property which has been unlawfully exempted or which no longer qualifies for exemption may be returned to the tax rolls). The record does not disclose why the Department revisited its decision.

¶ 23    On May 1, 2009, the parties finished briefing their cross-motions for summary judgment

in the exemption review action. On June 19, 2009, however, the property owner sought review of the superseded certificate. This additional request for administrative scrutiny was pending while the administrative law judge was considering the parties' cross-motions for summary judgment. The administrative law judge ruled on July 6, 2009, that a tax exemption was unjustified. In his written order, the judge summarized the pertinent facts and procedural history and noted in a footnote that the superseded certificate had been issued after the parties filed their cross-motions. The judge specified that the superseded certificate "has had no effect on this Order." On December 1, 2009, the same administrative law judge considered the parties' arguments regarding review of the superseded certificate and found that the first review involved the same property, the same parties, and the same operative facts and was dispositive of the issue of whether the property was exempt from taxation in 2007. The judge ruled that the principle of *res judicata* precluded a duplicative proceeding.

¶ 24    The property owner sought separate reviews of the two administrative decisions. The actions were consolidated before a single circuit court judge who found the first administrative decision was not against the manifest weight of the evidence and the second administrative decision was not a violation of due process. The circuit court judge affirmed the decisions and this appeal followed.

¶ 25    On appeal, we first consider whether the administrative law judge's decision on July 6, 2009, that the property was not in exempt ownership and not in exempt use, was against the manifest weight of the evidence. The property owner argues the record demonstrates the property should have been exempted from taxation because it is owned by a church and primarily used for religious purposes. The property owner, however, merely outlines this argument and we do not find it convincing:

> "The Church conducts religious services on the property which are open to the public. [Citation.] No profit was sought or earned. [Citation.].
>
> In addition, Reverend Michaels' residence on the property qualifies as a parsonage, an alternative ground for exemption. Although the Church's by-laws are silent regarding any requirement that George Michael reside on the property, his duties require him to do so. He conducts religious services there, he counsels individuals there, he helps with Sunday School and consults with others regarding the operation of the Church. [Citation.]"

¶ 26    The record does not substantiate that the property was owned by a religious entity and primarily used for religious services which were open to the public. Instead, the record indicates the property was primarily used as a private residence for George Michael, his wife Susan Michael, and their three daughters, which is a secular use. In their verified answer to the zoning violation suit, the church corporation and the Michaels unequivocally declared that the "single family dwelling on the subject property includes a chapel which is utilized for private prayer and private worship services for the Reverend Michael, his family and close friends." This characterization is substantiated by the deposition answers and interrogatory answers that were given in the instant proceeding. The record compiled indicates that even if George Michael did conduct religious services within the single-family dwelling, these services were essentially for his wife and perhaps their children and a few

close family members and friends. These services were publicized only by "word of mouth," there was no signage directing strangers to the private home on the shore of Lake Michigan, only once were people present that George Michael did not know, and they were guests of George Michael's brother. Furthermore, the small services were conducted only weekly or as infrequently as once a month, and each lasted only about an hour. Use of the property for religious services to this limited extent was an incidental use of the property when compared to its use as a private residence by the Michaels during all the other hours of the day and the days of the year. We conclude section 15-40(a) of the Property Tax Code does not exempt those who erect a chapel or sanctuary within a private home and then use the space from time to time for private contemplation and religious observances. 35 ILCS 200/15-40(a) (West 2006).

¶ 27    The alternative contention that the property was being used as a parsonage is similarly unpersuasive, due to the fact that George Michael was not living on the property as a condition of his employment or association with a church. See 35 ILCS 200/15-40(b) (West 2006).

¶ 28    For these reasons, we reject the conclusion that the administrative decision was against the manifest weight of the evidence, and we proceed to the next issue.

¶ 29    The contention that the administrative decision was improperly based on an analysis of religious doctrine is also unpersuasive. See *Three Angels Broadcasting Network, Inc. v. Department of Revenue*, 381 Ill. App. 3d 679, 696, 885 N.E.2d 554, 569 (2008) (courts are precluded from resolving disputes on the basis of religious doctrine); *Fairview Haven v. Department of Revenue*, 153 Ill. App. 3d 763, 773, 506 N.E.2d 341, 348 (1987) (first amendment precludes judicial involvement in the internal autonomy of religious organizations). The written decision does contrast the Michaels' Christian faith with the web-based church that instantly ordained George Michael and does emphasize the lack of affiliation between the Armenian Church of Lake Bluff and the Armenian Church of North America or St. Gregory the Illuminator Armenian Church of Chicago. However, this discussion was apparently included only to refute the statements in the exemption application and supporting documentation (George Michael's letter/affidavit and the three church bulletins) suggesting that the former or current leader of St. Gregory performed a religious ritual establishing the subject property as an Armenian Orthodox church within the Eastern Diocese of the Armenian Church of North America, were conducting weekly or holiday Armenian Orthodox services on the subject property, and were residing there in an Armenian Orthodox "parsonage." The statements on the exemption application and supporting documentation regarding Father Hazarian's and Father Jebejian's conduct or residence on the subject property were false or misleading and improperly bolstered the claimed entitlement to a religious-use exemption. It was appropriate for the administrative decision to address the factual basis for the exemption request. See, *e.g.*, *Three Angels Broadcasting Network*, 381 Ill. App. 3d at 696, 885 N.E.2d at 569 (courts may determine whether real property is in fact being used exclusively for religious purposes within the meaning of the tax code). The analysis was not a violation of any constitutional right.

¶ 30    The last issue to be addressed is whether the proceedings were a violation of due process. The exemption applicant presents two arguments. The first one concerns the superceded

decision which the Department issued while the cross-motions for summary judgment were pending before the administrative law judge. The exemption applicant contends the superceded decision was a flagrant violation of constitutional guarantees because as soon as the superceded decision was issued, any ruling by the administrative law judge would be superfluous and because the superceded decision was based on undisclosed information for undisclosed reasons. The second argument concerns the administrative law judge's decision that the first administrative review action (the one brought by the village and county to object to a tax exemption) operated as *res judicata* as to the second administrative review action (the one brought by the exemption applicant to object to the superceded decision which denied a tax exemption). The exemption applicant contends the issues in the two actions were decidedly different and that it was entitled to discover in the second review action how and why the superceded decision was reached.

¶ 31    Administrative proceedings are subject to due process principles including the opportunity to be heard by an impartial decision maker. *Sindermann v. Civil Service Comm'n*, 275 Ill. App. 3d 917, 923, 657 N.E.2d 41, 46 (1995). Evidence that an administrator failed to act with impartiality must be "concrete" (*Sindermann*, 275 Ill. App. 3d at 924, 657 N.E.2d at 46) and establish more than "[a] mere possibility of prejudice" (*Collura v. Board of Police Commissioners*, 113 Ill. 2d 361, 370, 498 N.E.2d 1148, 1152 (1986)). "Without a showing to the contrary, State administrators 'are assumed to be [people] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Scott v. Department of Commerce & Community Affairs*, 84 Ill. 2d 42, 55, 416 N.E.2d 1082, 1089 (1981) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941), and citing *Withrow v. Larkin*, 421 U.S. 35, 55 (1975)).

¶ 32    The exemption applicant has failed to meet this standard. Other than the timing of the superceded decision, the exemption applicant has not cited any indication that the administrative law judge failed to consider the evidence and issues with impartiality, conscientiousness, and " 'intellectual discipline.' " *Scott*, 84 Ill. 2d at 55, 416 N.E.2d at 1089 (quoting *Morgan*, 313 U.S. at 421, and citing *Withrow*, 421 U.S. at 55). The exemption applicant has not referred to any evidentiary ruling or procedural decision which suggests relief should be granted. The administrative law judge expressly acknowledged that the superceded decision had been issued while the cross-motions for summary judgment were pending before him in the administrative action, and affirmatively stated it "had no effect" on his disposition of the case. We have been given no reason to doubt this statement. Furthermore, the Department later accepted the administrative law judge's recommendation (his findings of fact and conclusions of law) as dispositive of the case, and it cannot be said that the Department prejudged the case by issuing the superceded decision. Lastly, the exemption applicant has not overcome the facts indicating that *res judicata* was properly applied to the second administrative action. The exemption applicant complains that the superceded decision was based on "undisclosed information kept secret by the Department" and that it would have used the second action to discover how and why the superceded decision was reached. However, the exemption applicant has not cited any facts indicating the superceded decision was based on anything other than the application and supporting documentation, which included the county's recommendation that the exemption be denied.

The evidence adduced during the administrative proceedings supports the county's recommendation to the Department. The record does not disclose why the Department revisited its initial decision; however, the Department was within its authority to do so. See 35 ILCS 200/15-25 (West 2008) (indicating property which has been unlawfully exempted or which no longer qualifies for exemption may be returned to the tax rolls).

¶ 33      For these reasons, we affirm.

¶ 34      Affirmed.